SENIORS CIVIL LIBERTIES
ASSOCIATION, INC., etc., et
al., Plaintiffs,

v.

Jack KEMP, etc., Defendant.

No. 89–607–CIV–T–17C.

United States District Court,
M.D. Florida,
Tampa Division.

April 1, 1991.

Mark B. Schoor, Fort Lauderdale, Fla., and John J. Fogarty, Clearwater, Fla., for plaintiffs.

Paul F. Hancock, Joseph D. Rich, Brian F. Heffernan, Housing and Civ. Enforcement Section, Civ. Rights Div., U.S. Dept. of Justice (Patricia Sharin Flagg, U.S. Dept. of Housing and Urban Development, Office of Gen. Counsel, of counsel), Washington, D.C., for defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This cause is before the Court on the following:

1. Plaintiffs' motion for summary judgment filed on August 20, 1990.

2. Plaintiffs' memorandum of law in support of motion for summary judgment filed on August 20, 1990.

3. Plaintiffs' request for oral argument filed on August 20, 1990.

4. Stipulation by the parties filed on August 22, 1990. (Attached as Exhibit)

5. Defendant's cross motion for summary judgment and reply to Plaintiffs' motion for summary judgment filed on September 20, 1990.

6. Defendant's legal memorandum in support of its motion for summary judgment and in reply to Plaintiffs' summary judgment motion filed on September 20, 1990.

7. Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgment filed on October 2, 1990.

8. Defendant's motion to strike portion of Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgment filed on October 9, 1990.

9. Defendant's corrected motion to strike portion of Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgment filed on October 11, 1990.

10. Plaintiffs' reply to Defendant's motion to strike portion of Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgment filed on October 15, 1990.

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983).

All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant,* 595 F.2d 994, 996–97 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.,* 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the party's case, and on which that party will bear the burden of proof at trial. *Id.* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.

The Court also said, "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at p. 324, 106 S.Ct. at p. 2553, 91 L.Ed.2d at p. 274.

This Court finds that there is an absence of a genuine issue as to any material fact present in this case. Therefore, this case will be decided as a matter of law.

Plaintiffs filed their complaint on April 28, 1989. The complaint alleged the following facts as relevant to the causes of action asserted:

1. The individual Plaintiffs, at all times material hereto, all have resided in dwelling units encumbered by documentary use restrictions which are covenants running with the land, and which predate the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601, *et seq.,* hereinafter referred to as "Act", which prohibits children from being a permanent resident of their "community", *ie.,* their respective condominium, subdivision, or mobile home park.

2. Each of the individual Plaintiffs is over 70 years of age, and acquired his dwelling unit as a permanent residence prior to September 13, 1988 with the reasonable expectations:

a. That these documentary restrictions, which violated no statutory or constitutional provisions of the law or Constitutions of the United States or the State of Florida, would continue to be valid and enforceable property and contract rights, free from impairment by any law of the State of Florida. so long as they were not arbitrarily and selectively enforced, and that these property and contract rights would not be taken by action of the United States Government.

b. Of privacy in continued peaceful possession of their respective dwelling units without the permanent presence of children under the age specified in their respective documents.

3. Each of the individual Plaintiffs' ownership or leasehold interest in his dwelling unit includes, as an appurtenance thereto, a joint ownership or use interest in the common areas/elements of their community, such as the recreation facilities and open space areas.

4. Each of the individual Plaintiffs purchased or leased his dwelling unit in reliance on advertising or written assurances that his community was an adult retirement community.

5. Each of the individual Plaintiffs resides in a community in which at least 80 percent of the dwelling units are occupied by at least one person 55 years of age or older, and intentionally chose to live in a community with such an age-homogenous environment.

6. Each of the individual Plaintiffs, by virtue of accepting the deed or lease to his property, agreed to be bound by the documentary restrictions encumbering his community, which documents constitute a mutual agreement among all of the dwelling unit owners or lessees in each community.

7. The Act, in 42 U.S.C. § 3602(k) defines "familial status" as: "... one or more individuals (who have not attained the age of 18 years) being domiciled with a parent, one having legal custody, or the designee of such parent or other person". The familial status is further bestowed upon pregnant women, and any

person in the process of securing legal custody of an individual under 18 years of age.

8. The Act, in § 3604, makes it unlawful to, based upon familial status, refuse to sell or rent, or otherwise make unavailable or deny, a dwelling to any person; to discriminate against any person in the terms, conditions, or privileges of sale or rental, or in the provision or services or facilities in connections therewith; and to make, print, or publish any notice, statements or advertisement with respect to a sale or rental indicating any preference, limitation, or discrimination.

9. By virtue of the aforementioned sections of the Act, enforcement of the documentary restrictions would be violative of the Act, and would subject the individual Plaintiffs, and the members of the Boards of Directors of their respective associations, as well as the associations themselves, to severe penalties for violating the Act.

10. The Act contains two exemptions, for two types of "housing for older persons", hereinafter referred to HFOP, which are material to the privately financed housing communities at issue, as described in §§ 3607(b)(2)(B) and (C). These HFOP exemptions are commonly known as the "62 or older" and the "55 or older" exemptions.

11. Although enacted on September 13, 1988, the Act by its terms did not take effect until March 12, 1989.

12. In order to qualify for the 62 or older exemption, all new occupants of a housing facility after September 13, 1988 must have been aged sixty-two or older. The presence of one underage occupant is fatal to qualification for the exemption.

13. The 62 or older exemption is restrictive in its definition and severely limits the use and marketability of Plaintiffs' dwelling units.

14. The 55 or older exemption requires that the housing facility have:

(i) ... significant facilities and services designed to meet the physical or social needs of older persons, or if the provision of such facilities and services is not practicable, that such housing is necessary to provide important housing opportunities for older persons; and

(ii) that at least 80 percent of the units are occupied by at least one person 55 years of age or older per unit; and

(iii) the publication of, and adherence to, policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older.

The Complaint contains the following causes of action against Defendants:

Plaintiffs seek to have this Court declare unconstitutional and enjoin certain provisions of the Fair Housing Amendments Act of 1988 as applied to the Plaintiffs on the grounds that they are violative of the following provisions of the Constitution of the United States:

1. The Act violates Plaintiffs' right to freedom of association guaranteed to them by the First Amendment and their right of privacy as guaranteed to them by the First, Fourth, Fifth and Ninth Amendments.

2. The Act deprives Plaintiffs of equal protection of the laws in that it deprives them of liberty and property rights in violation of the Fifth Amendment with no basis therefore.

3. The Act takes Plaintiffs' liberty and property interests for a private purpose, without compensation, in violation of the Fifth Amendment.

4. The Act deprives Plaintiffs of due process of law, by depriving them of vested property and contractual rights with no basis therefore, and subjects Plaintiffs PRIEL, RIEDEL and SHIPLEY to arbitrary and capricious discrimination without due process of law, in violation of the Fifth Amendment.

5. The Act, and the regulations promulgated thereunder by Defendant, deprive Plaintiffs of due process of law by virtue of the vagueness of the "Housing for Older Persons" exemptions, in violation of the Fifth Amendment.

6. Finally, the Act violates Plaintiffs' property and contract rights guaranteed them by the State of Florida, in violation

of both the Tenth Amendment and the principles of federalism embodied in the Constitution. The Act regulates purely local conduct, and is not a proper matter for federal regulation.

### THE PLAINTIFFS

The individual Plaintiffs are all residents of Pinellas County, Florida, and are all members of Plaintiff, Senior Civil Liberties Association, Inc. (hereinafter "SCLA").

Plaintiffs MOTYL own a detached single-family home in a subdivision known as Highland Lakes in Palm Harbor. They are retired, are in their seventies and are originally from Detroit. Prior to their retirement, they decided they wanted a quiet place to retire, in a "senior citizen's retirement subdivision", with no children. They found no such facility in Michigan, or in the Atlanta area and eventually came to Florida. After looking at several advertised areas, they decided on a new home in Highland Lakes. Moving to a new state and severing life-long relationships and friendships was very difficult, but their new adopted lifestyle without children "supersedes all previous sacrifices and hardships encountered so far."

All of the advertising by the developer described Highland Lakes as an "adult retirement community." A sign at the front entrance says "Highland Lakes for the Retirement Time of Your Life."

Highland Lakes is comprised of 2,360 single-family houses and villa units, plus a three-story, thirty-unit condominium apartment building. The entire subdivision is subject to a Declaration of Restrictions, which originally required at least one permanent occupant of a lot to be at least fifty years of age and prohibited permanent occupancy by anyone under sixteen. The common areas of the subdivision, including two clubhouses, two swimming pools and a twenty-seven hole executive golf course are, pursuant to the Declaration, owned and operated by a homeowner's association. The Declaration makes membership in the association mandatory with acquisition of title to an encumbered lot and grants the lot owner the right to use the association properties.

In 1989, the Declaration was amended to raise the minimum age to fifty-five and give the homeowners' association the power to assess for any alterations or improvements in order to provide facilities or services designed to meet the requirements of the Act.

The facilities presently include a twenty-seven hole executive golf course, two swimming pools, two clubhouses (each with a kitchen, auditorium, offices, small meeting rooms, management office and card rooms), tennis courts, shuffleboard courts, exercise classes, swimming classes, aerobics classes, ceramics, dances, entertainment, speakers at association meetings and association sponsorship of various clubs such as the men's club, theater club, travel club and organ club.

Plaintiff PRIEL is the owner of a double-wide, "tied-down" mobile home in Golden Crest Mobile Home Park, in Dunedin. She is seventy-eight. She and her late husband retired from upstate New York to the park in 1971. In 1975 they "traded up" to the present unit. When they purchased, they intentionally chose to live with people of their own age.

The original advertising for the park said it was a "retirement community." The Park Rules, which were part of the only lease she ever signed, in 1975, said it was an "adult park", although children could visit as guests. The Prospectus approved by the Florida Bureau of Mobile Homes in 1985, pursuant to Chapter 723, Florida Statutes, restated the adult-only rule by requiring that every resident shall be eighteen years of age or over.

Golden Crest Mobile Home Park has 176 mobile homes. The present facilities include a swimming pool, shuffleboard courts, pool table, laundry facilities, recreation building (with kitchen, library, piano, television, stereo and large tables), dinners, pot luck coffee hours, meals on wheels, congregate dining and public bus service. Most of the furnishings and equipment have been paid for over the years by the residents, and not the park owner. The recreation facilities are run by a Recreation Board, an unofficial entity created by the

park owner. The Board has no assessment powers. There is also an incorporated homeowners' association, created in 1987, pursuant to Chapter 723, Florida Statutes.

The Complaint alleges that shortly after the passage of the Act, the park owner threatened to stop enforcing the no-children rule unless the residents came up with money to pay for the installation of additional facilities and services. This demand was dropped in the face of pressure from the homeowners' association. The park owner amended the rules anyway, in 1989, to require that residents be fifty-five years of age or older.

Plaintiff SHIPLEY is in her seventies and from Virginia. Her husband is in his nineties. Neither of the Shipleys are in good health. They live in the Heather Lake Condominium Community, in Dunedin, comprised of twelve low-rise apartment buildings in ten separately declared condominiums. She purchased a unit in Condo II in 1979 or 1980 were she lived for a year before marrying her husband and moving into his unit in Condo X in 1981. Her husband's unit was purchased in 1979 or 1980 on re-sale from a speculator who had purchased from the developer.

Both of the SHIPLEYS purchased their units because the complex was for adults only. They have raised four children, but now, in their "later years", they cannot tolerate the noise which would be made by children residing in the complex.

All of the Declarations of Condominium in Heather Lake have the same provisions. The originally recorded Rules and Regulations require that each unit shall be used as a single-family residence of persons over the age of sixteen. In 1989, the Declaration was amended, with the expressed intent of qualifying for an exemption under the Act, to require that 80 percent of the units have at least one permanent occupant 55 years or older, and that all permanent occupants be at least 18 years of age.

The Heather Lake complex contains a recreation clubhouse (with kitchen, library, bathrooms, lounge, pool table, card tables, sofas, chairs, piano, television and tables), swimming pool, shuffleboard courts, entertainment, coffee hours, cookouts, "stitch & chat", card games, bingo, hospital volunteer program, Neighborly Senior Services, Inc., meals on wheels, "walking for fitness", Thanksgiving dinner, Christmas dinner dance, and outings.

In late 1988–1989, Plaintiff SHIPLEY put her unit in Condo II on the market for sale. When the Act took effect in March, 1989, she could not continue advertising the unit as "adults only" or "no children", for fear this would constitute a violation of the Act. Advertising consisted of a notice on the clubhouse bulletin board, and ads in two small local newspapers: the Palm Harbor Sounder and the Dunedin Times. The unit was eventually sold, in October, 1989. Plaintiff SHIPLEY did not use a real estate broker.

Plaintiffs RIEDEL are in their eighties and retired to Florida from New York City in 1963. They rented in various places, mostly in Clearwater Beach, until purchasing their unit in the Clearwater Point Condominium complex in December, 1982. They never saw any printed advertising materials, as they purchased on re-sale, but "it was generally known in the area that Clearwater Point was and is an 'adult community.'"

Plaintiffs RIEDEL are not in good health either. The prohibition against children contained in the condominium documents was also an important consideration to them when they purchased because of their age and their health.

Clearwater Point is comprised of eight separately declared condominiums, six of which are three-story townhouse clusters. The other two condominiums, including theirs, are each comprised of two high-rise apartment buildings. The two buildings which comprise the RIEDELS' condominium contain a total of 137 units. The entire community contains a much greater number of units.

The recreational facilities for the complex are owned by a separate corporation controlled by the eight condominium associations. There are two small heated pools and a large heated pool and jacuzzi, adjacent to which is a small building with showers and toilets, a barbecue area and beach-

front. Pursuant to the condominium documents, unit owners (only) may, upon purchasing their units, elect to join the corporation and obtain use rights in the facilities, which Plaintiffs RIEDEL did. Once elected, this right runs with ownership of the unit.

The Declaration of Condominium has, at least since they acquired their unit, prohibited children under sixteen from residing on the premises. Their condominium association has not amended the Declaration since the passage of the Act.

Plaintiffs MOTYL, PRIEL and SHIPLEY make the educated guess that virtually all of the units in their communities are occupied by at least one person over fifty-five. Plaintiffs RIEDEL do not know, knowing only that most residents are retired.

PRELIMINARY ISSUES:

### LOCAL RULE 3.01

This Court first addresses the propriety of Plaintiffs' memorandum in opposition to defendant's cross motion for summary judgment and the arguments therein filed on October 2, 1990. In response to this memorandum, Defendants filed a motion to strike portion of Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgment on October 9, 1990. Defendants later filed a Corrected Motion to Strike Portion of Plaintiffs' Memorandum in Opposition to Defendant's Cross Motion for Summary Judgment on Oct. 11, 1990.

The conflict hinges upon whether the Defendant intended his discussion of legislative history to be part of his cross motion for summary judgment or part of his reply to Plaintiffs' summary judgment. If Defendant intended his discussion of legislative history to be a reply to Plaintiffs' motion for summary judgment, then Plaintiffs' memorandum in opposition to Defendant's cross motion was improperly titled and in essence is a "reply to a reply" which is prohibited, not only by Local Rule 3.01(b), but by the aforementioned Scheduling Conference. If, in fact, Plaintiffs' correctly labeled their motion as a cross motion, then Plaintiffs' were within their right to reply to Defendant's cross motion for summary judgment pursuant to Local Rule 3.01(b).

■ This Court finds that whether Plaintiffs' Reply would be considered a reply to a reply or a reply to a cross motion is a technical controversy that need not be specifically resolved in this particular instance. The controversy need not be specifically resolved because this is a case of first impression and its arguments should be given broad latitude. Therefore, this Court denies Defendant's corrected motion to strike portion of Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgment and will consider all parts of Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgment.

### STANDING

The Court's first concern is whether Plaintiffs have alleged sufficient standing to bring this lawsuit.

Plaintiffs allege in their complaint that:
1. Plaintiffs are in need of the requested declaratory relief as the Act and the regulations promulgated thereunder, require an immediate and significant change in their conduct, and in the conduct of the associations which govern their communities and enforce their documents, and in the lifestyle Plaintiffs have contracted for by virtue of accepting the deed or lease to their dwelling units. The Act provides for serious penalties in the nature of substantial civil fines for violation, that may be levied without the requirement of any intent on the part of the Plaintiffs or their associations to violate the Act.
2. Plaintiffs are in doubt as to their rights, duties and liabilities under the Act and their respective documents in that, they verily believe that their constitutional rights as set forth in each of the Claims herein are abridged by the Act.
3. Plaintiff SHIPLEY is further in need of the requested relief, as her unit is on the market for resale and she wishes to preserve the age-homogeneous environment of her community, yet has ceased using "adult only" language in advertise-

ments for her unit for fear of potential liability for violation of the Act.

4. Plaintiff SHIPLEY is further in need of the requested declaratory relief by virtue of her being a member of the Board of Directors of her condominium association charged with the ultimate responsibility of approving or disapproving resales and rentals of units in the condominium administered by her association.

5. Plaintiff PRIEL is further in need of the requested declaratory relief because the owner of her mobile home park has notified the homeowners association, of which she is a Director and the Secretary, that unless the lot owners pay for the installation and operation of communal cooking and dining services, the acquisition and operation of automobiles for transportation services and indemnify the park owner in case a of suit against him for violation of the Act by virtue of continued enforcement of the documentary restrictions prohibiting children, at an immediate "start-up cost" to each lot owner of over $1,000.00 per unit, the park owner will no longer enforce the child restriction, thereby destroying the retirement community nature of the park, in which she has been a permanent resident since at least 1972.

6. Each of the individual Plaintiffs is further in need of the requested declaratory relief because each are threatened with a deprivation or taking of his rights in and to a child-free environment through the actions of others over whom he has no direct control: other unit owners in their community selling or renting their units and the governing associations and management companies with the power to approve such transactions.

7. Each of the Plaintiffs is in need of the requested supplemental injunctive relief as each will suffer irreparable harm, and there is no adequate remedy for the destruction of the character of the Plaintiffs' residences and communities should children be permitted to reside therein.

8. Plaintiffs' irreparable injury is due to the unavailability of an adequate legal remedy; there is a substantial likelihood of success on the merits; the threatened injury to the opposing party or to the potential recipients of the familial status benefits of the Act is minimal as there is no documented shortage of ownership or long-term lease housing in the area; and issuance of a preliminary injunction would not disserve the public interest.

Those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In addition, Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Further, abstract injury is not good enough. The Plaintiff must show that he "has sustained or is immediately in danger of sustaining some direct injury" as the result of challenged official conduct and that the injury or threat of injury is both "real and immediate," not "conjectural" or "hypothetical." *Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

First of all, Defendant has moved to dismiss this action for lack of jurisdiction over the subject matter; *ie.,* on the grounds that Plaintiffs lack standing to bring this action for declaratory relief pursuant to 28 U.S.C. § 2201. Specifically, Defendant's motion complains of insufficient allegations of standing in the Complaint. Plaintiffs answer by stating and arguing that Defendant's motion is without merit.

This Court finds that it has jurisdiction according to 28 U.S.C. § 2201 to hear this action for declaratory relief and also to grant supplemental relief according to 28 U.S.C. § 2202. In *Allstate Ins. Co. v. Employers Liability Assurance Corp.,* 445 F.2d 1278 (5th Cir.1971), the court held that the declaratory judgment remedy is an all-purpose remedy designed to permit an adjudication whenever the court has jurisdiction, there is an actual case or controversy and an adjudication would serve a useful

purpose. The court also held that the Declaratory Judgment Act is remedial, and is to be liberally construed.

■ Defendant also contends that Plaintiffs have failed to allege the requisite standing because they did not show that they have suffered, or are threatened with, a distinct and palpable injury as a result of Defendant's actions and because the relief that Plaintiffs request will not redress the injury.

Defendant relies on *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In that case, the respondent filed suit in Federal District Court against petitioner, City of Los Angeles and certain of its police officers, alleging that in 1976 he was stopped by the officers for a traffic violation and that although he offered no resistance, the officers, without provocation or justification, seized him and applied a "chokehold", rendering him unconscious and causing damage to his larynx. In addition to seeking damages, the complaint sought injunctive relief against petitioner, barring the use of chokeholds except in situations where the proposed victim reasonably appeared to be threatening the immediate use of deadly force. The respondent alleged that he justifiably feared that any future contact he might have with police officers might again result in his being choked without provocation and that there was thus a threatened impairment of various rights protected by the Federal Constitution. The District Court ultimately entered a preliminary injunction against the use of chokeholds under circumstances that did not threaten death or serious bodily injury and the Court of Appeals affirmed. The Supreme Court reversed.

The Supreme Court held that the federal courts are without jurisdiction to entertain respondent's claim for injunctive relief. The court reasoned that the respondent's standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokehold by police officers. The Court held that the fact that respondent may have been illegally choked by the police in 1976, does not establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer who would illegally choke him into unconsciousness without any provocation.

This Court is not persuaded by Defendant's arguments for several reasons. First, the case involves the State's criminal laws. Second, the threat of future injury was much more speculative in *City of Los Angeles* because any future threat to the respondent from the City's policy or from the conduct of police officers would be no more real than the possibility that he would again have an encounter with the police and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation. On the other hand, it is very possible that either a private party living in Plaintiffs' communities may sell their home to a family with children or that the management of Plaintiffs' communities may not let them advertise and sell their properties to families without children. Therefore, the injury is not as speculative. Third, Plaintiffs in the instant case are more immediately threatened because no illegal act must occur to start the process.

This Court is persuaded by Plaintiffs' rebuttal arguments. Plaintiffs' first rebuttal argument relies on the case of *Atlanta Gas Light Co. v. United States Department of Energy*, 666 F.2d 1359 (11th Cir. 1982) for its authority. In that case, the court held that declaratory relief in the context of a pre-enforcement challenge to the constitutionality of regulatory legislation and regulations promulgated thereunder is within this court's jurisdiction, even though no concrete injury may have yet occurred, as the occurrence of an injury is not dispositive of the issues of standing and ripeness. *Id.* at pp. 1363–64 n. 7.

The Court finds this reasoning applicable to the instant case because both cases involve pre-enforcement challenges to the constitutionality of regulatory legislation. Therefore, although a concrete injury has not yet occurred in the instant case, the case may still be ripe.

Plaintiffs also cite *International Society for Krishna Consciousness v. Eaves*, 601 F.2d 809 (5th Cir.1979). In that case, a religious organization and others brought suit to challenge as unconstitutional a municipal ordinance regulating distribution of literature and solicitation of funds at city-owned airports. The United States District Court for the Northern District of Georgia refused to grant a preliminary injunction and Plaintiffs appealed. The Court of Appeals held that Plaintiffs' anticipatory challenge to a provision prohibiting the receipt or acceptance of donations except at certain solicitation booths presented a justiciable controversy. The court did begin its reasoning, however, by stating that a plaintiff must not be allowed to enlist the aid of a federal court in a general effort to purge unconstitutional measures from the body of the law. The court then qualified this statement by stating that this is not by any means to suggest that we should be hostile to anticipatory challenges because they play a most vital role in modern efforts to enforce constitutional rights. The court also stated that it is not necessary that a party first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights. *Id.* at 817. Once again, however, the court qualified its reasoning.

The court qualified its reasoning by incorporating the premises of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). *Marbury* requires a court to insist that an anticipatory challenge to a statute's constitutionality grow out of a "real, substantial controversy between parties, a dispute definite and concrete." The Court stated that it cannot always be satisfied by a plaintiff's formal allegation that he wishes to violate the challenged statute, for such an allegation could be honestly made by a plaintiff interested only in sweeping unconstitutional legislation from the statute books. The *Marbury* court also stated that it can be certain that a constitutional challenge grows out of a genuine dispute and is not a contrivance prompted solely by a desire to enforce constitutional rights if we know that the allegedly unconstitutional statute interferes with the way the plain-

tiff would normally conduct his affairs. Lastly, the *Marbury* court stated that it is usually sufficient, although not necessary, that the plaintiff have a role in an organization dedicated in part to activities proscribed by the challenged statute and assertedly protected by the constitution.

The *Eaves* case stands for the principle that anticipatory challenges play a vital role in modern efforts to enforce constitutional rights, but that these challenges must not be allowed to go unchecked. *Eaves* enunciates the standards to be applied to anticipatory challenges to determine if they are legitimate and therefore permissible. Upon applying the standards set out in the *Eaves* case to the instant case, this Court finds that Plaintiffs have standing to sue for the following reasons.

*Eaves* requires that an anticipatory challenge to a statute's constitutionality grow out of a real and substantial dispute. In the instant case, Plaintiffs are in doubt as to their rights, duties and liabilities under the Act and their respective documents. Additionally, Plaintiffs are seeking rulings on the constitutionality and the enforceability of the familial status portions of the Act in advance of conduct which will invite an investigation or complaint by Defendant, or a private lawsuit by an allegedly aggrieved party. This Court therefore finds that a real and substantial dispute is present in this case.

Also, following the reasoning set forth in the *Eaves* case, which stated a court can be certain that a genuine dispute is present if the allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct his affairs, this Court also finds that Plaintiffs have met their burden to prove standing.

The Act, and the regulations promulgated thereunder, require an immediate and significant change in the conduct of the Plaintiffs and the associations that govern their communities and enforce their documents and in the lifestyle Plaintiffs have contracted for by virtue of accepting the deed or lease to their dwelling units. This change in the way Plaintiffs conduct their affairs is necessary because the Act

provides for *serious* penalties in the nature of substantial civil fines for violation that may be levied without any requirement of intent on the part of Plaintiffs.

Also, the Act can cause a "chilling effect" on the actions and conduct of Plaintiffs in that Plaintiffs, although desiring to preserve the age-homogeneous environment of their community, would cease to use "adult-only" language in their advertising for fear of potential liability for violation of the Act. For these reasons, the Court concludes that possible future enforcement of this statute significantly interferes with the way Plaintiffs would normally conduct their affairs.

Finally, following the *Eaves* case and its reasoning, standing is usually sufficiently shown when a plaintiff has a role in an organization dedicated in part to activities proscribed by the challenged statute and assertedly protected by the constitution. In the instant case, all Plaintiffs are members of the Senior Civil Liberties Association (SCLA). According to Plaintiffs, SCLA is a not-for-profit corporation which was organized for the purpose of promoting and protecting the civil rights of older Americans and representing its members in any lawful proceeding or action initiated or existing in furtherance of the contractual or civil rights of elderly persons to enjoy peaceful occupancy and use of their home, condominium or cooperative apartments or mobile homes either owned or rented wherever situated. This statement of SCLA's purpose put forth by Plaintiffs demonstrates that the organization is dedicated in part to activities proscribed by the challenged statute. Accordingly, Plaintiffs have standing to bring this lawsuit.

Defendant further contends that the individual Plaintiffs have failed to demonstrate that their purported injuries are traceable to the Department of Housing and Urban Development (hereinafter HUD) because they cannot and do not allege that HUD has either told them that their communities are not within the "55 or older" exemption to the Act or that HUD has tried in any other way to limit whatever rights they or anyone in their community may have to sell or use their property.

Plaintiffs respond by stating that they cannot or do not allege that HUD has ever told them that their communities are not within the "55 or older" exemption because HUD will not take a stand on the question of whether their communities in fact qualify for an exemption even though they have conducted discovery on the issue. HUD does not issue declaratory or advisory opinions.

It is undisputed that HUD refuses to tell anyone whether they qualify for an exemption until someone guesses wrong. At this point an exhaustive and expensive investigatory process is undertaken by HUD. Following from this, it is virtually impossible for the Plaintiffs to know whether they qualify for an exemption until there is *actually a case.*

This Court is not persuaded by Defendant's last contention because there is no way Plaintiffs can know that they are in violation of the Act until they actually do something and it is challenged by HUD. The Court finds that Plaintiffs have standing in spite of the absence of an advisory opinion from HUD.

Defendants also allege that Plaintiffs have failed to prove any facts which demonstrate that Plaintiff SCLA has standing as an organization to bring the instant action. In support of this allegation, Defendant cites the cases of *Hope v. DuPage,* 738 F.2d 797 (7th Cir.1984), *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977) and *Anderson et al. v. City of Alpharetta,* 770 F.2d 1575 (11th Cir.1985).

After a thorough reading of the above cited cases, this Court finds that they can be distinguished from the instant case. For example, in all three cases the organization was suing as the *representative* of a class action and not as an *individual* plaintiff. This is not the situation in the instant case. Plaintiffs do not assert that SCLA represents any of its members in this action. SCLA is apparently suing as an individual plaintiff and not on behalf of any of its members. Therefore, even though the complaint is somewhat weak in its averments concerning the individual

standing of SCLA, this Court finds that all named Plaintiffs have adequate standing to bring this lawsuit.

## LEGISLATIVE HISTORY

The applicable sections of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601, *et seq.* (1988) read as follows:

### § 3604. Discrimination in the sale or rental of housing and other prohibited practices

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or natural origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or natural origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin.

Because the Act itself contains no expressions of congressional purpose or intent, the Court looks to the report of the House Judiciary Committee, H.R.Rep. No. 100–711, *reprinted* 1988 U.S.Code Cong. & Ad.News 2173, and the floor debates in Congress, where the original bill was amended. 134 Cong.Rec. H4603–4607 (daily ed. June 22, 1988), H4679–4688 (daily ed. June 23, 1988), S10454–20469 (daily ed. Aug. 1, 1988), H6497–6501 (daily ed. Aug. 8, 1988)

Both parties allege that Congress was presented with overwhelming evidence that discrimination against families with children was a major national problem in need of congressional attention and action. There the similarities end.

Plaintiffs further allege that although the House Report states the purpose of the "familial status" portions of the Act was to deal with an increasing difficulty that people with children are having in finding housing, none of the studies cited in the house report attest to any nationwide problem these people are having in finding homes *to purchase.* Plaintiffs also allege that in the initial presentation of the bill on the House floor, the familial status provisions of the Act were again explained in terms of the problems created by the fact of too much rental housing prohibiting children. Finally, Plaintiffs call this Court's attention to the comments made by Rep. Fish. Rep. Fish described the problem solely in terms of rental housing, and stated that:

> The aim is not to disrupt the lives of senior citizens or the operation of legitimate retirement communities. Rather, we seek to expand the availability of rental units for young families without arbitrary exclusions and limitation. 134 Cong.Rec. H4605.

Plaintiffs conclude by stating that the legislative history does not support Defendant's assertion that Congress was presented with any evidence that documentary age restrictions in ownership housing are a problem.

Defendant alleges that a substantial amount of testimony focused on how dis-

crimination was a problem for families in *all* types of housing units and transactions. Defendant contends that Congress was presented with evidence that documentary age restrictions were a problem in ownership housing and did in fact intend to alleviate discrimination in ownership housing as well as in rental housing by passing this Act.

Most of the pertinent legislative history is contained in the *Hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives, One Hundredth Congress, First Session on H.R. 1158, Fair Housing Amendments act of 1987* (hereinafter known as *House Hearings*), and the *Hearings before the Subcommittee on the Constitution of the Committee on the Judiciary, United States Senate, One Hundredth Congress, First Session on S.558, A Bill to Amend Title VIII of the Act Commonly Called The Civil Rights Act of 1968, to Revise the Procedures for the Enforcement of Fair Housing, and for Other Purposes* (hereinafter referred to as *Senate Hearings*).

■ After reading all the pertinent legislative history, this Court agrees with Defendant that the Fair Housing Amendments Act of 1988 applies to both rental and ownership housing.

Although nothing in the reports and hearings of both the House and the Senate directly states that this Act includes discrimination in *ownership* housing, all materials speak to "the housing market" and "housing discrimination" in general.

The Fair Housing Amendments Act of 1988 came before Congress exactly 20 years after the Fair Housing Act of 1968 was passed. Congress stated when they passed the Fair Housing Act of 1968, that they could no longer tolerate discrimination in the *sale or rental of housing* on the basis of race, color, religion, or national origin. In 1974, sex was added to this list. Twenty years later, with discrimination and segregation well-documented, Congress saw the need to add to the list of protected classes, families with children and individuals with handicaps. In short, it was the legislature's intent to open up *all* forms of

housing to parents with children under 18 except those that are designed for older persons and qualify for an exemption

Defendant also asserts that a substantial amount of the legislative history focuses on criticism of the discrimination laws of other states. According to the statement and testimony of James Morales found at *Senate Hearings*, pp. 166–210, sixteen states and the District of Columbia currently have laws prohibiting child discrimination. Mr. Morales also testified that many advocates have had a difficult time going against powerful real estate interests who oppose bills that would prohibit housing discrimination against families with children. Mr. Morales further testified that the result of this is that the vast majority of states do not have laws and those that do generally have weak and ineffectual laws that are riddled with exemptions that permit discrimination to continue because they fail to cover *all* real estate transactions.

Mr. Morales then goes on to give some examples. Illinois, for example, protects families with younger children but does not protect families with older children above the age of fourteen. Also, nine of the sixteen states with housing discrimination laws, Florida incidentally not being one of them, limit their laws to encompass only rental units and thus do not apply to discrimination in the sale of property. Other states do not cover specific types of housing such as mobile home parks and condominiums.

Mr. Morales concludes by stating that amending the Fair Housing Act to protect familial status would obviously not end child discrimination, but it would, with the addition of the strengthening of administrative remedies, become one of the strongest fair housing laws for families in the country. Not only would it provide remedies in those States where none exist, but would also close many of the loopholes that currently exist in the State Laws, such as covering rental, but not ownership housing, and provide further remedies in the Federal Courts. *Id.* at 168.

This Court interprets Mr. Morales' statements to mean that Congress designed the Act to alleviate all the listed forms of discrimination present in *all* housing arrangements.

The testimony of David S. Liederman found in the *House Hearings,* pp. 163–72, also addresses this subject matter. Mr. Liederman testified that it is time to establish a national anti-discrimination standard for treatment of families seeking homes anywhere in the United States. He further testified that the existing sixteen state statutes offer varying degrees of fair housing protection to families but none can offer assurance of coverage for *all* families. Mr. Liederman then asks that the legislature provide a minimum level of fair housing for families with children as part of the overall effectiveness of Title VIII. *Id.* at 170.

Defendant further argues that the Act addresses discrimination that is prevalent in two common types of ownership housing, namely, mobile homes and condominiums. The statement of the American Planning Association, found at *House Hearings,* pp. 513–20, states that interest in manufactured housing, and mobile homes in particular, has surged greatly in recent years, the greatest attraction being low cost and low maintenance. The statement also refers to a state-wide study of mobile home parks which revealed that 63% expressly stated that they were "adult-only." The Association further states that families with children are encountering extreme difficulties in finding mobile home housing and that their frustrations are manifested through a growing number of lawsuits in which current or prospective residents are challenging age-restrictive policies of mobile home parks. Lastly, the statement points out that the increased demand for affordable housing by families, as well as significant changes in the design of mobile homes, make the exclusionary practices of some park owners all the more unfair and detrimental to the welfare of society. *Id.* at 516.

Congress also heard testimony regarding discrimination occurring in condominiums. One report in particular, also from the American Planning Association, states that condominiums traditionally have catered to the elderly or to the young and therefore have age-restrictive rules or covenants. The Association concluded that as a result, families with children have been greatly excluded from this segment of the housing market. *Id.* at 516.

The Court concludes that the purpose of the Fair Housing Amendments Act is to put into effect an overall system that uniformly protects all states and alleviates discrimination against families in *all* housing markets. Congress was informed and took into consideration the problems occurring in the rental and sales of single-family homes, mobile homes and condominiums.

Plaintiffs did present a thought-provoking argument. Plaintiffs contend that the primary studies were restricted to rental housing and that Congress was not presented with any evidence that discrimination against families with children in the ownership context was a national problem to any extent. Therefore, Plaintiffs contend that applying the Act retrospectively to ownership housing is not rationally related to the problem as perceived by Congress.

The Court concedes that most, but not all, of the testimony brought before Congress concerned the affect that age discrimination was having on rental housing. This Court notes that the reason for this emphasis on rental housing is well documented in the legislative history. The studies and reports consistently stated that over the past ten years more and more Americans have been unable to purchase homes and have been forced into the rental market. Factors that have forced this shift have included high interest rates, and energy and inflation-related increases in land prices, and construction costs, to the point where the average cost of a single-family home is over $100,000. At the same time the supply of affordable rental housing has not expanded to meet the demand. This has been due to cuts in federal funds subsidizing the construction of housing for low and moderate-income people, as well as changes in tax laws and other conditions

making multi-family housing less attractive to developers.

Besides these economic factors, the last ten years have seen a shift in demographic factors affecting housing. More and more baby boomers are postponing marriage, delaying having children, and are living alone, or as couples or in other small households. At the same time, more and more people over 55 are enjoying longer life expectancies, also in households of one or two. These two groups, the baby boomer and the seniors are competing with less affluent families with larger households for what is available in the way of rental housing. Landlords prefer to rent to smaller households who are perceived to have larger, or at least steadier, incomes and quieter, less disruptive lifestyles.

Upon further examination of the legislative history, the Court notes other items which round out the history. Congress was provided with a nationwide statistic that stated that about 35% of all families depend on the rental market. *House Hearings,* p. 514 (Statement of the American Planning Association). Second, James Morales' testimony, found at *House Hearings,* pp. 374–75, extended the above history by further stating that with household size decreasing and childless households increasing, *developers and landlords* do not have to respond to the demands of families with children to make their businesses financially successful. Mr. Morales' testimony also stated that instead, developers can build houses and apartments with fewer bedrooms and less square footage and landlords can refuse to rent to families with children or impose other policies that severely restrict the number of children in units. Third, the prepared statement of Homer C. Floyd found on pp. 241–42 of the *Senate Hearings* provides some insight into the economic situation discussed above. Mr. Floyd's statement declares that discrimination against families with children also injures middle and higher income families because even though they may not be trapped in the rental market, they are likely to find that income alone will not necessarily buy them the housing of their choice should that choice include condominiums and other facilities which exclude children.

The legislature was presented with an awesome amount of information concerning the need to alleviate discrimination based on familial status. The Act in question was intended to close all the loopholes and make all the State laws uniform. It is this Courts opinion that the Act was intended to encompass both the sale and rental of single-family dwellings, mobile homes and condominiums. Therefore, this Act would apply to any alleged discriminatory practices of Plaintiffs or their associations, unless their communities qualify for an exemption.

## RETROACTIVITY

Plaintiffs insist that the Act applies retrospectively to existing ownership housing and is therefore unconstitutional.

More specifically, Plaintiffs allege that the application of the Act to existing ownership communities creates disparate treatment. Plaintiffs state that while the developer of a new community can, from the outset, plan to include whatever is deemed sufficient to qualify for the "55 or Over" exemption, and factor those additional cost into the sales of the units, Plaintiffs do not have that luxury.

Finally, Plaintiffs allege that since it is only the retrospective application of the Act to existing ownership housing that is at issue, there is no rational basis for failing to exempt existing communities from the familial status provisions of the Act, while exempting existing housing facilities from the "building code" provisions of the "handicap" provisions of the Act. § 804(f)(3)(C).

Defendant has not addressed the issue of retroactivity. However, Plaintiffs state that Defendant may respond that exempting existing structures from the building code provisions was a practical necessity in that to require landlords to undertake such major structural renovations would wreak financial havoc on the landlords, while unduly disrupting the lives of their tenants while the renovations are being undertaken.

In seeking justification for retroactive application of the familial status provisions to the Plaintiffs, Plaintiffs argue that the Constitution does not provide greater protection to profit-motivated activities than to the conduct of people's lives.

■ This Court is not persuaded by Plaintiffs' arguments because it finds that the Act does not apply retrospectively. For this reason, no justification for retroactivity is necessary. In fact, this Court would also be open to the suggestion that the familial status portions of the act are prospective for the very *same* reasons that Plaintiffs feel the handicap provisions are. Further reasons for this Court's holding are as follows.

This Court would once again address the "Housing For Older Persons" exemptions of the Act set out *supra.* pp. 38–39.

This Court relies on *White v. U.S.,* 191 U.S. 545, 24 S.Ct. 171, 48 L.Ed. 295 (1903). In that case, the Court said:

> Where it is claimed that a law is to have retroactive application such must be *clearly* the intention, evidenced in the law and its purposes, or the court will presume that the lawmaking power is acting for the future, and *not* for the past; that it is enacting a rule of conduct which shall control the future rights and dealing of men, rather than review and affix new obligations to that which has been done in the past. (emphasis added)

*Id.* at 552, 24 S.Ct. at 172, 48 L.Ed. at 295.

This Court can find no clear intent expressed in the Act that any of its provisions should act retrospectively. There are, however, certain provisions that clearly express that they are to be applied prospectively. For example, § 807(b)(3)(A) and (B) read as follows:

> (3) Housing shall not fail to meet the requirements for housing for older persons by reason of:
>
> (A) persons residing in such housing as of September 13, 1988, who do not meet the age requirements of subsections (2)(B) or (C): Provided, that new occupants of such housing meet the age requirements of subsection (2)(B) or (C); or

> (B) unoccupied units: Provided, that such units are reserved for occupancy by persons who meet the age requirements of subsection (2)(B) or (C).

These provisions go a step further and make the age requirement explicitly prospective. If Congress wanted to make the whole Act prospective, Congress could have included a similar provision regarding the other requirements of the exemptions. However, this was not done. This Court speculates that this was not done because Congress presumed that all presently existing facilities were likely to qualify, but could not presume that all current residents met the age requirement; hence, the different treatment.

This idea is also furthered by legislative history. Representative Synar's testimony, found at *House Hearings,* p. H4681 reads in part that:

. . . . .

> The gentleman from Florida addressed that [retrospective application] and he tried to make the statement that would require expenditures of money in order to qualify. The fact of the matter is if one looks at the report language of the committee we do not require specific facilities to be *retrofitted* in order to meet this qualification. Second, and most importantly, most of the senior citizen-type housing in this country already meets these types of restrictions and limitations.

Once again this Court finds the whole idea of "significant facilities and services specifically designed to meet the physical or social needs of older persons" is a function of what the older person intended it to be when they chose the place in which they now reside. These facilities need not now be retrofitted to better fit the language of the Act.

This Court speculates that existing older person housing already qualifies for the exemption. For the future, however, Congress has seen fit to give additional guidelines for determination of appropriate older person housing.

## CONSTITUTIONAL ISSUES:

### THE COMMERCE CLAUSE

■ The Commerce Clause is found in Article I, § 8 of the United States Constitution and reads in part as follows: "Congress shall have the power to regulate commerce with foreign nations and among the several states and with Indian tribes ..."

The definitions of "commerce" and "commerce among the several states" are set out in *Gibbons v. Ogden*, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23 (1824). In that case, the Court defined "commerce" as commercial intercourse—anything related to buying and selling. The Court defined "commerce among the several states" to mean any commerce (commercial intercourse) that affects more than one state. The Court went on to say that the activity didn't have to cross state lines in order to constitute interstate commerce.

Plaintiffs contend that Congress does not have authority under the Commerce Clause to regulate age-restricted housing as it has done in the Act. In support, Plaintiffs assert that there is "no activity 'in' or 'in the flow of' interstate commerce" due to the fact that "any construction materials which once moved in interstate commerce have long since been affixed to the realty" and "any advertising utilizing instrumentalities of interstate commerce is long over."

Plaintiffs also contend that "they are now home, long retired from their life in commerce. Any further involvement of interstate commerce, when and if it is remotely involved, is separate, distinct, and merely fortuitous."

Plaintiffs further contend "any incidental effect on interstate commerce or interstate travel is also purely speculative." Plaintiffs state that "there is no indication that any parent transferred to Florida from out of state for business reasons has had any problem finding a home or apartment to purchase because of the existence of child restrictions in ownership housing, or even that the documented shortage of rental housing in other parts of the country has anything to do with existing age restrictions in ownership units available for rental."

This Court is not persuaded by Plaintiffs' reasoning, and supports Defendant's position and analysis.

Defendant relies on the recent case of *Preseault v. I.C.C.*, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) in which the Supreme Court held that "[courts] must defer to a congressional finding that a regulated activity affects interstate commerce 'if there is *any rational basis for such a finding.'*" (Emphasis added) *Id.*

Defendant further cites *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). In that case, the appellant challenged the constitutionally of 28 U.S.C. § 2201 which prohibited discrimination against race in public accommodations affecting commerce.

The Court stated that "the determinative test of the exercise of power by the Congress under the Commerce Clause is whether the activity sought to be regulated is 'commerce which concerns more States than one' and has a real and substantial relation to the national interest," which includes the interstate travel of citizens. The Court explained that racial discrimination in the hotel burdened interstate commerce by hindering the interstate mobility of the population. The Court further explained that this discrimination discouraged certain persons from interstate travel.

The above scenario is very close to the scenario in the instant case. With the present mobility of the population in mind, it is certainly foreseeable that if an increasing amount of subdivisions, mobile homes, condominiums and apartments regularly excluded families with children, these same families would be prevented from seeking new housing around the country. The possibility of this discriminatory treatment would most likely prevent such families' interstate travel, and therefore affect interstate commerce. Additionally, the efficient allocation of labor among interstate components of the economy would be hindered, once again affecting interstate commerce.

Therefore, if housing discrimination against families with children occurred a

substantial amount of times, it would inhibit the ability and desire of families to travel interstate. Because interstate travel is a form of interstate commerce, this discrimination against families with children could have a far-reaching effect on interstate commerce, and thus would fall within Congress' ambit to regulate.

By using its power to regulate in this sphere and eliminating housing discrimination based on familial status, Congress provided a rational means of removing impediments to the interstate movement of people and commerce.

Defendant further contends that Plaintiffs' argument ignores the reality of ownership housing. Defendant explains that in considering this legislation, Congress reasonably concluded that the fact that construction of a home was complete, or the fact that such a home may be subject to only "occasional resale," does not remove it from the flow of interstate commerce and thereby insulate it from Congressional regulation.

Defendant contends that Plaintiffs have not presented a plausible argument that individual sales of their own homes do not affect interstate commerce in some manner under the decisions of the Supreme Court. Real estate concerns do business on an interstate basis. Homes are renovated and improved utilizing instrumentalities and goods in interstate commerce. Most basically, people travel across state lines to purchase homes. Plaintiffs cannot deny that a substantial majority of older persons in Florida moved there from out of state. In fact, all of the individual Plaintiffs did so.

This Court is further persuaded by the reasoning in the *Heart of Atlanta* case wherein the Court stated that "if it is interstate commerce that feels the pinch, it does not matter how *local* the operation which applies the squeeze." Also, with regard to local action, the *Heart of Atlanta* case held:

[I]n deciding the constitutional power of Congress ... we do not consider the effect on interstate commerce of only one isolated, individual, local event, without regard to the fact that this single local event when added to many others of a similar nature may impose a burden on interstate commerce by reducing its volume or distorting its flow. *Id.* 379 U.S. at 268–70, 85 S.Ct. at 363, 13 L.Ed.2d at 275.

Further, in *McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) the Supreme Court determined that certain aspects of local real estate activity are subject to Congressional regulation under the Commerce Clause. The Court finds that Congress has the power to regulate through the Act, the local real estate activities of the Plaintiffs which includes occasional resale.

The final Commerce Clause contention involves the case of *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). In that case, the activity at issue was the fixing of prices of title insurance. The Court held that this activity was a *commercial* service that was an integral part of the financing of the purchase of property, which financing operated in interstate commerce.

Plaintiffs contend that in *Goldfarb* the minimum fee schedule was a commercial service that affected all sales of property all over the country, whereas, in the instant case, there is no showing of anything other than occasional individual resales of units—an action that does not constitute commercial activity.

Defendant states that this distinction is not persuasive because Plaintiffs' attempt to downplay the degree of commercial action in the ownership of existing housing communities as "occasional resales" is belied by their own actions. This Court is in full agreement with the Defendant because three out of the four individual Plaintiffs admitted in their interrogatories to rental, sale or resale of their housing units since they have been residing in Florida. These actions would not be classified as "occasional resales."

In conclusion, this Court finds that Congress has the power to regulate discriminatory practices that are occurring in all

types of housing through the Fair Housing Amendments Act.

## TENTH AMENDMENT

■ Plaintiffs also contend that the Act violates their property and contract rights as guaranteed them by the State of Florida, in violation of both the Tenth Amendment and the principles of federalism embodied in the constitution. Plaintiffs further contend that the Act regulates purely local conduct and is not a proper matter for federal regulation.

Plaintiffs base their claim on the fact that the people of Florida amended their Constitution in 1980 to add a new, express right of privacy to the Florida Declaration of Rights. Article I, Section 23 of the Florida Declaration of Rights provides:

> Right of privacy—Every natural person has the right to be left alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.

Plaintiffs contend that the Florida Supreme Court has held that, consistent with express invitations to do so by the United States Supreme Court, the citizens of Florida, in adopting this amendment, opted for more protection from governmental intrusion than afforded by the United States Constitution. Plaintiffs rely on *In re T.W.*, 551 So.2d 1186 (Fla.1989).

Plaintiffs further argue that since the State of Florida has chosen to affirmatively act to grant its citizens greater privacy rights than those granted by the federal government, the Tenth Amendment comes into play to void any attempt to interfere therewith under the guise of the Commerce Clause.

This Court finds Plaintiffs' argument without merit. Plaintiffs are relying on the outdated concept of "dual federalism." Dual Federalism stood for the proposition that the Tenth Amendment is a check upon the plenary power of Congress—even if the commerce power is correctly applied. However, the Supreme Court, in *Garcia v. San Antonio Metropolitan Transit Au-*

*thority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), sets out the Tenth Amendment limits on Congress' authority to regulate State activities.

Defendant correctly points out that there is no regulation of a state activity present because the Act is directed at private housing conduct that has no relation to the state, and therefore no relation to the Tenth Amendment.

Defendant further argues that the Supreme Court, in *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988), noted that "*Garcia* holds that the [Tenth Amendment] limits are structural, not substantive—ie., that states must find their protection from Congressional regulation through the national political process, not through judicially-defined spheres of unregulable state activity." In addition, the *South Carolina* court reasoned that: "Nothing in *Garcia* or the Tenth Amendment authorizes courts to second-guess the substantive basis for congressional legislation. Where, as here, the political process did not operate in a defective manner, the Tenth Amendment is not implicated." *Id.* at 512, 108 S.Ct. at 1361.

This Court notes that it is questionable whether Plaintiffs have standing to raise the claims of the State of Florida. However, the Court will not address that issue in light of the fact that after *Garcia*, it appears that the Tenth Amendment has been virtually eliminated.

Additionally, as in the *Garcia* case, there is no indication that the political process involved in drafting the Act has not worked properly. This Court finds that the legislative history indicates that Congress gave substantial attention to numerous considerations during its deliberations on the Act.

Plaintiffs also contend that under the Federal system, the regulation of the real property rights of its citizens is one of the most important aspects of the sovereignty retained by the States. Plaintiffs further argue that the regulation of how the State's people live is particularly a matter of local concern, especially when the preservation of a way of life involves no invidious discrimination.

Plaintiffs argue that because Florida has chosen to enact a broad state constitutional protection of privacy, the Federal Fair Housing Amendments Act must be struck down. This interpretation blatantly violates the Supremacy Clause contained in Article VI of the United States Constitution. The Supremacy Clause mandates that whenever state and federal law conflict, it is the state, not the federal provision which must be voided. See again, *Garcia, supra.*

For the aforementioned reasons, this Court finds that the Fair Housing Amendments Act does not violate the Tenth Amendment of the United States Constitution.

## RIGHTS OF PRIVACY AND ASSOCIATION

■ Plaintiffs have also alleged that the Act violates their right of privacy as guaranteed to them by the First, Fourth, Fifth and Ninth Amendments and their right to freedom of association as guaranteed to them by the First Amendment.

Plaintiffs contend that the right of privacy has both "decisional" and "spatial" aspects, both of which converge in the instant case.

Plaintiffs cite *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), which states that "the Constitution embodies a guarantee that a "certain private sphere of individual liberty will be kept largely beyond the reach of government."

Plaintiffs address, in turn, "decisional" and "spatial" privacy. "Decisional" privacy involves privacy in personal living and family arrangements. *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). In that case the Court stated that the right of decisional privacy is protected not because these decisions contribute, in some direct and material way, to the general public welfare, but because they form so central a part of an individual's life.

"Spatial" privacy recognizes a privacy interest with respect to places—the very basic right to be free within the privacy of one's own home from "sights, sounds, and tangible matter (one) does not want." *Reeves v. McConn,* 631 F.2d 377 (5th Cir. 1980), *quoting Rowan v. United States Post Office,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).

Defendant contends that Plaintiffs claim an alleged right of privacy which extends *far* beyond any such right carved out by the Supreme Court. The Supreme Court has consistently limited the "private sphere" to highly personal, intimate relationships that are not present in this case. Those protected relationships are best exemplified by marriage and the creation and sustenance of a family. Of the cases addressing intimate relationships, two cases involved contraception, one involved pregnancy, one involved childraising, two involved marriage and one involved marital privacy.

As to "decisional" privacy, Defendant contends that while the dissenting opinion in *Bowers* argued that such a right *may* exist, the Court in that case did not find a violation of that right in a far more "intimate" setting than the facts in this case. In the *Bowers* case, the Court was asked to extend privacy to include consensual homosexual sodomy—a much more intimate relationship then the one present in the instant case. The Court, however, refused to do so, stating that privacy has been extended as far as it will ever go. As a result of that case, it seems as if the Court is not likely to create more fundamental rights nor expand the definitions of those fundamental rights that already exist.

Moreover, the Act does not involve a breach of the "physical integrity of the home" as referred to in the *Bowers* case and there is no mandated physical invasion of Plaintiffs' private residences which could give rise to a Fourth Amendment claim.

As to "spatial" privacy, Defendant contends that the case relied on by Plaintiffs is inapposite. The *Reeves* case involved a First Amendment challenge to municipal regulation of sound amplification ostensibly designed to protect privacy rights of citizens. This Court agrees with Defen-

dant's argument and finds that although *Reeves* may stand for the proposition that such sound regulation is appropriate in certain circumstances, it certainly does not stand for the proposition that there is a constitutional right to be free from the sounds of children. Furthermore, this Court does not interpret the *Bowers* case to stand for the proposition that there is a fundamental right contained in the constitution "not to have children around."

Both Plaintiffs and Defendant rely on *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In *Roberts*, the Court stated that:

> Family relationships, by their nature, involve deep attachments and commitments to the *necessarily few* other individuals with whom one shares not only a special community of thoughts, experiences and beliefs but also distinctly personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. (emphasis added)

The Court finds that Plaintiffs have not demonstrated the existence of such *highly personal relationships* in the sale or rental of housing units in their respective communities. The Court also notes that all Plaintiffs live in communities ranging from well over one hundred to several thousand housing units. There is no "family" relationship between residents of different units in the development. There is no indication of *any* relationship other than neighbor. Further, none of the Plaintiffs set forth any facts that speak to the type of relationship necessary to support their privacy and free association claims. Plaintiffs allege that having children in their communities gives rise to detrimental health effects. The Court concludes that the Act neither affects the immediate "family" of any of the Plaintiffs nor requires persons to admit children into their homes. Moreover, what occurs at a neighbor's house obviously does not involve the creation and sustenance of Plaintiffs' families.

Defendant also points out that Plaintiffs' communities are not selective. This Court can find no facts that suggest that potential homeowners in Plaintiffs' communities are screened as to beliefs, lifestyles, habits, etc. The facts of this case indicate that the only basis of selection is the age of permanent residents.

Defendant further contends that other undisputed facts dilute even what little selectivity exists. Defendant calls this Court's attention to the fact that three out of four of the Plaintiffs live in communities that prior to the recent changeover to a 55 and older requirement had age restrictions that precluded children as permanent residents, but had no age limit beyond that as to homeowners. This indicates to this Court that before the Act required residents of certain communities to be a specific age, the only age prohibition was against children as permanent residents. This demonstrates less selectivity than Plaintiffs suggest to this Court to be present.

■ With the foregoing in mind, it is crucial to note that Plaintiffs' overlapping freedom of association argument concerning this topic is also without merit.

Plaintiffs argue that the legislative history of the Act and the Preamble to the Regulations, make it clear that while Congress intended to protect the "legitimate rights of older persons" to live in childless retirement communities, it has unduly restricted that choice to only certain types of housing, containing "significant" facilities and services designed to met the "physical and social" needs of the residents.

Plaintiffs also contend that the consistently recognized needs and desires of many of the elderly for the quiet companionship of their peers and the psychological support inherent in an age-homogeneous environment are completely ignored.

Plaintiffs further contend that many older people want to live their lives in peace and quiet, without children, and with other older people who share their pleasures and pains, and who understand what it means and feels like to have reached their stage in life.

This Court cannot adopt Plaintiffs' reasoning because communities like the Plaintiffs' have traditionally allowed *anyone* who can contract and who does not have children to reside there. This Court agrees with Defendant that were Plaintiffs to adopt the Act's familial status provisions exempting housing for older persons, the "right" of older persons to associate with persons their own age would be *furthered* more than under restrictions previously in effect because then over eighty percent of the residents would assuredly be over fifty-five.

Plaintiffs also argue that freedom of association for purely social and personal purposes is a separately identified fundamental right which, nonetheless, overlaps with the right of decisional privacy. Plaintiffs rely on *Roberts v. United States Jaycees*, see *supra:*

> ... choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.

*Id.* at 617–618, 104 S.Ct. at 3249, 82 L.Ed.2d 462.

> ... the protection of individual liberty includes protection of certain kinds of personal bonds which cultivate and transmit shared beliefs, thereby fostering diversity, and acting as critical buffers between the individual and the power of the state.

*Id.* at 618–619, 104 S.Ct. at 3250, 82 L.Ed.2d 462.

> Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability

independently to define one's identity that is central to any concept of liberty.

*Id.*

Plaintiffs also rely on *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir.1984). In that case, the Eleventh Circuit applied a right of association to protect a police officer from being fired merely because he was dating the daughter of a reputed organized crime chief. This Court finds, however, that the *Wilson* case involved more of an intimate relationship than that of the ones involved in the instant case.

Additionally, this Court concludes that Plaintiffs' freedom of association claim must fail for the same reason that their privacy right claim failed.

Although the Supreme Court held in *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), that the right of association is not restricted to relationships among family members, the Supreme Court emphasized in the *Roberts* case, *supra*, that the First Amendment protects only those relationships, including family relationships, that presuppose the "deep attachments and commitments" to "necessarily few" individuals.

The Court finds that no such private or intimate relationship is present in the instant case. Each association of persons who chose to live in Plaintiffs' respective communities is large, and in some cases the association is very large. The residents there constitute less unified and less selective groups than either of the organizations at issue in *Roberts* or *Rotary Club, supra,* both of which were held to lack the distinctive characteristics of the intimate groups entitled to First Amendment protection.

Defendant correctly reiterates that the only characteristic that the residents of Plaintiffs' respective communities may have in common is being over a certain age. Moreover, Defendant is correct in pointing out that persons living in their respective communities have no stated purpose which sets them apart from the millions of other persons, including families with children, seeking an affordable and desirable place to live.

This Court additionally notes that the Act does not in any way prevent Plaintiffs from associating or not associating with whomever they wish in their communities. Plaintiffs are free to ignore families with children who move in next door to them if they so desire.

In conclusion, this Court finds that the Plaintiffs are not involved in the sort of "intimate human relationships" referred to in the case law. Therefore, Plaintiffs have not met their burden of demonstrating facts sufficient to support either the right to privacy or freedom of association claims.

## VAGUENESS

■ Plaintiffs allege that the Act, and the regulations promulgated thereunder by Defendant, deprive Plaintiffs of due process of law by virtue of the vagueness of the "Housing for Older Persons" exemptions. Defendant responds that Plaintiffs' argument must fail because the statute and the regulations that define the exemptions are more than sufficiently precise to satisfy due process.

The Court, in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), enunciates the "void for vagueness" doctrine. The *Grayned* court stated that:

[I]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment

freedom," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109, 92 S.Ct. at 2299.

The case of *Village of Hoffman Estates et al. v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) further clarifies the above principles. In that case the Court stated that:

These standards should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.

Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply. *Id.* at 489–90, 102 S.Ct. at 1186–89.

Plaintiffs and Defendant differ as to how strict a test should be applied to this particular statute. Based on the aforementioned

criteria, this Court finds that a less stringent vagueness test should be applied to this statute.

In light of this Court's previous analysis concerning the Commerce Clause, the Court finds that this Act constitutes economic regulation and is therefore subject to a less strict test. Developers will be most affected by this legislation in the future. Developers conduct their business according to economic demands and can be expected to consult and interpret relevant legislation in advance of taking action. Although Plaintiffs have previously argued that this particular legislation is not economic to the particular Plaintiffs involved in the case, the Court finds that not only will most, if not all, currently existing housing facilities qualify, in the future developers will plan their projects to qualify, and the qualification will continue when later resale occurs.

This Court finds that a violation of the Act subjects Plaintiffs primarily to civil liability. *Cotton States Mutual Insurance Co. v. J.O. Anderson*, 749 F.2d 663 (11th Cir.1984). That case held that the existence of civil penalty provisions in a civil statute does not change the tenor of the law. The *Anderson* court stated that the mere fact that a large sum of money is at stake does not make a statute penal in nature. The *Anderson* court further stated that even if construed as a penal statute, a non-criminal statute is not unconstitutionally vague if persons of reasonable intelligence can derive a core meaning from the statute. *Id.* at 669.

As previously discussed, this Court finds that the Act does not inhibit freedom of association as defined by the Constitution and case law. Therefore, this Court finds that a less strict vagueness test should apply.

The present controversy centers on the "Housing for Older Persons" exemptions. These "Housing For Older Persons" exemptions are found in Section 807 of the Act, 42 U.S.C. § 3607(b), and read in part as follows:

(b)(1) Nothing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling. Nor does any provision in this subchapter regarding familial status apply with respect to housing for older persons.

(2) As used in this section, "housing for older persons" means housing—

(A) provided under any State or Federal program that the Secretary determines is specifically designed and operated to assist elderly persons (as defined in the State or Federal program); or

(B) intended for, and solely occupied by, persons 62 years of age or older; or

(C) intended and operated for occupancy by at least one person 55 years of age or older per unit. In determining whether housing qualifies as housing for older persons under this subsection, the Secretary shall develop regulations which require at least the following factors:

(i) The existence of significant facilities and services specifically designed to meet the physical or social needs of older persons, or if the provision of such facilities and services is not practicable, that such housing is necessary to provide important housing opportunities for older persons; and

(ii) that at least 80 percent of the units are occupied by at least one person 55 years of age or older per unit; and

(iii) the publication of, and adherence to, policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older.

(3) Housing shall not fail to meet the requirements for housing for older persons by reason of:

(A) persons residing in such housing as of September 13, 1988, who do not meet the age requirements of subsections (2)(B) or (C): Provided, that new occupants of such housing meet the age requirements of subsection (2)(B) or (C); or

(B) unoccupied units: Provided, that such units are reserved for occupancy

by persons who meet the age requirements of subsection (2)(B) or (C).

The Court once again looks to the legislative history to provide additional insight. Both the House and the Senate heard testimony concerning the possible effects of a federal prohibition of familial status discrimination on age-restricted ownership housing in senior citizen retirement communities. As a result, the legislative history is replete with expressions of congressional intent to protect the choice of many older Americans to live together in retirement-type communities.

In reading the applicable legislative history, this Court found a substantial amount of specific and persuasive testimony on this point. See, 134 Cong.Rec. H4605 (daily ed. June 22, 1988) (remarks of Rep. Fish) ("Finally, the bill contains language aimed at protecting senior citizens retirement communities—those that are intended for and principally occupied by the elderly. The aim is not to disrupt the lives of senior citizens or the operation of legitimate retirement communities."); *Id.* at H4606–07 (remarks of Rep. Pepper) ("There are some who say that the rights of senior citizens to reside in an all senior community will be taken away if this bill is enacted. I am here today as a well-known advocate for senior citizens, to say unequivocally, that this will not happen. The Act fully protects the rights of senior citizens who live in retirement communities, and would allow these communities to exclude families with children if they so chose."); *Id.* at H4608 (remarks of Rep. Edwards) ("We were careful in writing the bill to make clear exceptions for "housing for older persons" —senior citizens who live in retirement communities will not be forced to live with children."); *Id.* at 4680–81 (remarks of Rep. Synar) ("As a member of the Select Committee on Aging and one who is deeply involved and concerned about the issues facing our older citizens in this country, I have studied this issue at great length and … the committee went to great lengths to make exceptions which we believe take care of the situations which would affect our elderly."); 134 Cong.Rec. S10469 (daily ed. August 1, 1988) (remarks of Sen. Kennedy) ("it was never intended to be a requirement that additional kinds of services would be necessary in order to enjoy the provisions and protections of the act."); *Id.* at S10557 (remarks of Sen. Cranston) ("fair and balanced compromise that protects young families and senior citizens alike."); *Id.* at S10558 (remarks of Sen. Metzenbaum) ("fine-tuning led to 'flexibility' of exemptions.").

By creating the "Housing for Older Persons" exemptions, Congress provided for the concerns of senior citizens who desire to live together within the context of legislation which had the principle goal of remedying the problem of discrimination based on familial status. The Court concludes that Congress intended for the exemptions to have flexible application, which tends to undermine Plaintiffs' contention that this statute is unconstitutionally vague.

Plaintiffs allege that the entire familial status scheme of the Act must be held void for vagueness as applied to pre-existing communities with documentary age restrictions. Plaintiffs further allege that Congress intended to exempt housing for older persons, but failed to draw the qualifications in such a way as to make the exemptions meaningful and understandable.

Plaintiffs' vagueness challenge is primarily directed to § 807(b)(2)(C)(i) of the Act, which is the "significant facilities and services" prong of the three-part test for qualification for the "55 or Over" exemption.

The regulations do not define "significant facilities and services specifically designed to meet the physical or social needs of older people", however, Rule 100.-304(b)(1) does give a nonexclusive list of examples that include social and recreational programs, continuing education, information and counseling, recreational, homemaker, outside maintenance and referral services, an accessible physical environment, emergency and preventive health care programs, congregate dining facilities, transportation to facilitate access to social services, and services designed to encourage and assist residents to use the services and facilities available to them. The Rule concludes by stating that the housing facility need not have all these features to quali-

fy for the exemption under this subparagraph.

Plaintiffs contend that in light of the nonexclusive list and the fact that not all the mentioned features are required to qualify for an exemption, significance is in the eye of the beholder. Plaintiffs also correctly point out that the Preamble to the act admits "[i]t is not possible to define precisely what services and facilities must be present before they are considered 'significant.'"

Plaintiffs also contend that "specifically designed" to meet the physical and social needs of older persons is a subjective concept because none of the examples listed above are inherently designed for older people.

A housing facility without "significant facilities and services" may still satisfy this exemption if a two-pronged test is met. However, Plaintiffs contend that the two-pronged "not practicable" and "important housing opportunities" alternative to the "significant facilities and services" requirement of Section 807(b)(2)(C)(i) is equally incomprehensible. See *supra.*

Rule 100.304(b)(2) states that in order to satisfy this two-pronged test under the Act, the owner or manager "must demonstrate through credible and objective evidence that the provision of significant facilities and services ... would result in depriving older persons in the relevant geographic area of needed and desired housing. The Rule lists several factors that are relevant in meeting the requirements of this paragraph. The factors are:

(i) Whether the owner or manager of the housing facility has endeavored to provide significant facilities and services designed to meet the physical or social needs of older people either by the owner or by some other entity. (This provision is subject to the caveat that demonstrating that such services and facilities are expensive to provide is not alone sufficient to demonstrate that the provision of such services is not practicable.)

(ii) The amount of rent charged, if the dwellings are rented, or the price of the dwelling, if they are offered for sale.

(iii) The income range of the residents of the housing facility.

(iv) The demand for housing for older persons in the relevant geographic area.

(v) The range of housing choices for older persons within the relevant geographic area.

(vi) The availability of other similarly priced housing for older persons in the relevant geographic area.

(vii) The vacancy rate of the housing facility.

In other words, if similarly-priced housing with significant facilities and services is reasonably available in the relevant area, then the housing will not qualify for the exemption, even if it otherwise satisfies the "not practicable" test.

Plaintiffs contend that the factors listed by the rule make sense when applied to developers or landlords, but do not make sense when applied to Plaintiffs. Plaintiffs also contend that the regulations are totally silent on the question of physical impracticability. For example, what if there is no available land or space within the buildings in which to install any facilities? Plaintiffs further contend that the housing facility must also satisfy the requirement that it is "necessary to provide important housing opportunities for older persons", but no objective standard is given for "necessity" or "important". Plaintiffs contend that what is most important to them is being able to continue to live where and as they have been living. Finally, once again Plaintiffs are correct in stating that in the Preamble to the Regulations the Secretary concedes that additional guidance is needed in providing a more precise definition of the "important housing opportunity" criterion, and that Rule 100.304(b)(2) had been drawn guided only by statements of certain proponents of the legislation during the floor debates.

Defendant responds that the facilities and services requirement gives constitutionally sufficient notice concerning the requirements of the exemption. Defendant

further responds that the fifteen examples of the types of facilities and services that will be considered significant are more than ample guidelines to enable a person of average intelligence to obtain the exemption.

Defendant relies on numerous determinations of "No Reasonable Cause" by HUD which were issued in response to complaints of familial status discrimination. This Court is persuaded by these determinations of "No Reasonable Cause" because the facilities and services provided in Plaintiffs' communities are very comparable to those found by HUD to be sufficient to satisfy that provision of the Act. For example, there are two determinations which parallel Plaintiffs' situations. In both these cases, the Department determined that reasonable cause did not exist to find that a discriminatory housing practice had occurred.

Lastly, Defendant argues that if Plaintiffs could establish that this particular exemption was unconstitutionally vague and the exemption was struck down, it would not help Plaintiffs because the ban on familial status discrimination would remain.

This Court finds that the statutes and the regulations that define the exemptions are more than sufficiently precise to satisfy due process and are therefore not unconstitutionally vague. The reasons for this finding are set out below.

According to the applicable legislative history, the definition of significant facilities and services contained in the "55 and over exemption" was drafted to encompass the entire spectrum of housing providers, from large corporations to individual landowners. The legislative history indicates that both Congress and HUD purposely avoided constrictive requirements to allow housing providers *flexibility* to provide the services and facilities best suited to the needs of their particular residents and their geographic location. Therefore, Congress' decision to allow housing providers leeway to satisfy the exemption in numerous ways does not render the provision unconstitutionally vague. *Flexibility* is the key.

The services and facilities present in adult-only housing run from large complexes with numerous facilities and services to small apartment complexes with a pool and a recreation room. This, along with the examples given in the Rules, tends to get individuals who are trying to interpret the Act caught up with quantity over quality. Generally, the extent of the recreation facilities and services offered at any particular community is related to the size of the complex and the original selling price of the units. Keeping in mind that the legislature intended these exceptions to be flexible in order to provide for varying desires of senior citizens, it is apparent that those senior citizens would not move into a complex that they didn't find an adequate combination of affordability and desirability. A small complex with just a pool and recreation room might be all that was desired by its residents because the residents main desire was a quiet, age-homogenous environment. To these residents this complex contains significant facilities and services specifically designed to meet the physical or social needs of older persons.

This Court also finds that the "significant facilities and services" prong is not unconstitutionally vague because it is a compromise between the price of the housing and the desires of the particular residents. Additionally this Court finds that the "specifically designed to meet the physical or social needs of older persons" prong is not unconstitutionally vague because the bottom line is the age of the persons using the facility. The physical needs will automatically be met in the future due to contemporaneous handicap legislation and the social needs will be met because no matter what the extent of the facilities, the age of the people using them is what is vital. A gathering of older persons who have reached the same place in life and have a lot in common, no matter where it is or what setting it is in, meets the social needs of these individuals.

Plaintiffs argue that their communities qualify for an exemption. Plaintiffs cite, in support of this claim, the affidavit of Robert Tankel, Esq. Mr. Tankel, who is alleged to be an expert in this field, states in his affidavit that while a greater percentage of communities marketed to retirees and empty-nesters have more extensive

recreation facilities because of a perception in the development industry that retired people are interested in, have the time to devote to, and will be attracted to, activity-oriented communities with lots to do, these facilities are no different in kind or design from those in communities marketed to activity-oriented younger people. (Tankel, pp. 17–19)

According to Attorney Tankel, the only thing that distinguishes the facilities and services in communities in Southeast and Gulf Coast Florida designed for and marketed to younger persons is the age of the persons using them rather than anything inherent in the facilities. Attorney Tankel further states that this has been influenced by two related factors: the existence of a child restriction in the documents, and the original marketing campaign by the developer, the thrust of which was a result of his decision to include a child restriction in the documents.

The Court finds that the communities meet the requirements of the exemption.

Although this Court finds the alternative two-prong test of "not practicable," and "such housing is necessary to provide important housing opportunities for older persons" a bit harsh, this Court concludes it is not vague. The Preamble states that this exemption was intended to be narrowly used only when it can be shown that the cost would result in depriving low and moderate income persons of needed and necessary housing. The Court has concluded that the legislature intended that the first part of this exemption would provide the broad flexibility necessary to protect the desires of senior citizens. The Court cannot identify any vagueness problem associated with this test.

In conclusion, this Court finds that the Fair Housing Amendments Act gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. This Court also finds that although the Act is still subject to court interpretation, the standards it sets out are adequately explicit. Therefore, this Court finds that the Act is not unconstitutionally vague and should not be voided. Although this Act is still subject to some court interpretation, it is not "void for vagueness."

## FIFTH AMENDMENT

Finally, Plaintiffs contend that the Act deprives them of equal protection of the laws because it deprives them of liberty and property rights, in violation of the Fifth Amendment. Plaintiffs also claim that the Act takes their liberty and property interests for a private purpose, without compensation, in violation of the Fifth Amendment. Plaintiffs further contend that the Act deprives them of vested property and contractual rights and subjects Plaintiffs PRIEL, RIEDEL and SHIPLEY to arbitrary and capricious discrimination without due process of law, in violation of the Fifth Amendment.

## EQUAL PROTECTION

Plaintiffs contend that the Act violates their equal protection rights as applied to the federal government through the Fifth Amendment because the discrimination is gross enough to be deemed a confiscation. Plaintiffs argue that the Act discriminates against them by interfering with their choice to live in a community which excludes children. Plaintiffs further argue that the Act discriminates against them because there is no rational basis or justification for application of the Act to Plaintiffs when there is no indication of documentary age restrictions in existing ownership housing in Florida having anything to do with a shortage of rental apartments elsewhere in the country.

Defendant contends that Plaintiffs' claims are without merit. The Court agrees.

It is a fundamental principle that in order to establish a colorable equal protection claim, Plaintiffs must show that the Act has created a classification that violates equal protection principles. This Court does not find that Plaintiffs have met this burden. The Act is designed to prohibit discrimination on the basis of familial status. The Act requires that persons with and without children be treated without distinction in the sale and rental of hous-

ing. The only classification created by the statute is one which exempts certain groups of older persons from this prohibition, a classification which Plaintiffs are not challenging on an equal protection basis.

This Court understands that the basis of Plaintiffs' equal protection claim is that the Act is discriminating against a group of people who want to continue to be able to discriminate on the basis of familial status. Even assuming that this is an appropriate basis for an equal protection challenge, this Court agrees with Defendant's contention that Plaintiffs cannot meet their heavy burden of demonstrating that such a "classification drawn by the statute is not rationally related to a legitimate state interest." This proposition was set out in *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

As to the rational relationship to a legitimate state interest, Plaintiffs *never* contend that this asserted classification is *not* rationally related to the primary purpose and basis of the familial status provisions of the Act which is to provide a remedy for the widespread housing discrimination against families with children. The legislative history is replete with evidence demonstrating that discrimination on the basis of familial status is a severe problem in both rental and ownership housing.

As to the legitimate state interest, Congress also recognized that a prohibition against discrimination based on familial status would reduce barriers to interstate movement of persons and the efficient allocation of labor among interstate components of the economy.

This Court concludes that eliminating discrimination on the basis of familial status is rationally related to a legitimate state interest and is therefore not a violation of equal protection.

## IMPAIRMENT OF VESTED CONTRACT AND PROPERTY RIGHTS

■ Plaintiffs contend that the Act, as it applies retroactively to existing age-restricted housing, violates the Due Process Clause of the Fifth Amendment. Plaintiffs rely on *Pension Benefit Guaranty Corp.*

*v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). In that case, the Court held that in order to not be violative of due process, legislation must not be "particularly harsh and oppressive" or "arbitrary and irrational."

Plaintiffs emphasize that, in the Plaintiffs' communities, development is over. Plaintiffs also argue that the business of construction and marketing by the developer is finished. Plaintiffs further argue that while dollars are still spent by the Plaintiffs, they are spent in the form of payment of assessments levied by their not-for-profit associations for the cost of maintenance and repair of the common elements and common areas which are appurtenances to their units. This activity, Plaintiffs contend, is no more properly viewed as within the scope of "economic regulation" than it is as "commerce." Finally, Plaintiffs contend that because they already own their housing, the Act is "retrospective economic legislation" that violates the Due Process Clause as applied to them.

This Court notes that Plaintiffs admit that the Contract Clause of Article I, § 10 only applies to the states and not to Congress. Plaintiffs challenge this legislation *only* under the Due Process Clause of the Fifth Amendment. The case of *Pension Benefit, supra*, emphasized that a due process challenge to a federal law must satisfy a *higher* burden than that necessary to prove a violation of the Contract Clause. *Id.* at 732–33, 104 S.Ct. at 2719–20. (Emphasis added)

Plaintiffs contend that existing case law on the protection of vested contract and property rights from the actions of Congress can only serve as a guide in this case because there is no modern precedent dealing with a lifestyle decision or the constitutionally protected rights of privacy and association being effectively destroyed by congressional regulation. Plaintiffs then contend that the personal decisions, rights and expectations of the Plaintiffs are entitled to at least as great protection as the economic rights and investment-backed ex-

pectations of those in the business world, which are involved in the modern cases.

Plaintiffs rely on the reasoning set out in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). In that case, the Court held that legislation "adjusting the burdens and benefits of economic life come[s] to the Court with a presumption of constitutionality, and the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."

Plaintiffs seem to agree with Defendant that legislation adjusting the burdens and benefits of personal decisions, rights and expectations comes to the Court with a presumption of Constitutionality and it is Plaintiffs' burden to establish that the legislature has acted irrationally. This Court finds that Plaintiffs have not met their burden.

Defendant also contends that Plaintiffs' assertion that the Act operates "retroactively" is without merit. The Court agrees with Defendant. Defendant relies on *Pension Benefit Guaranty Corp., supra.* That Court held in part that:

> [T]he strong deference accorded legislation in the field of national economic policy is no less applicable when the legislation is applied retroactively. Provided the retroactive application of a statute is supported by a legitimate legislative purpose furthered by a rational means, judgments about the wisdom of such legislation remains within the exclusive province of the legislative and executive branches.

*Id.* at 729, 104 S.Ct. at 2717–18.

Defendant argues that according to the above reasoning, even if it is assumed that the provisions of the Act apply retroactively, Plaintiffs cannot meet their burden concerning the rational basis for the act. This Court agrees. The Act and the rules promulgated thereunder set rules for *future* use and transfer and interfere with the expectations of past purchasers only regarding the future use of their property by themselves and by others.

Defendant argues that readjustment of such expectations is constitutional and again cites the *Usery* case, *supra.* In that case, the Court also stated that the "cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Id.* at 16, 96 S.Ct. at 2893.

## TAKING WITHOUT JUST COMPENSATION

▌ Plaintiffs allege that a "right to exclude children" from a "buffer zone" around their homes has been taken without compensation. Plaintiffs claim a taking of alleged property rights to exclude children from their communities and to rely on the exercise of those covenants by others in their communities.

Defendant responds that if Plaintiffs' claim is based upon violation of restrictive covenants by others, Plaintiffs have standing to sue those individuals only. This Court agrees. Further, Defendant points out that according to the reasoning in the case of *Hodel v. Irving*, 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987), Plaintiffs cannot assert a taking claim against HUD because "the government has considerable latitude in regulating property rights in ways that may adversely affect the owners." *Id.* at 713, 107 S.Ct. at 2082. For these reasons, this Court finds that Plaintiffs' taking claim is not ripe.

Defendant relies on *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). That case held whether or not legislation violates the Fifth Amendment's prohibition against the taking of private property without just compensation depends largely upon the particular circumstances in that case. That Court enunciated certain factors that are considered. One factor is the extent to which the government action diminishes the economic value of property, specifically by interfering with distinct investment-backed expectations. Another factor considers the character of the governmental action. The Court must consider whether the legislation is a physical invasion by the government or if it is part of some public program adjusting the

benefits and burdens of economic life to promote the common good.

The Court has weighed the above factors, and finds that Plaintiffs have not suffered a taking adequate to constitute a violation of the Fifth Amendment.

This Court notes that it is difficult to ascertain to what extent the familial status provisions of the Act took anything from Plaintiffs. Plaintiffs claim the taking of *all* age-restricted ownership housing by the very enactment of the Act. However, Plaintiffs have made no claim for compensation. Plaintiffs stated in their answers to interrogatories that they have suffered no injury to date. Further, Plaintiffs have not presented a concrete controversy concerning the Act's economic effect on "particular parcels of land." Plaintiffs has not established that their property values will be diminished as a result of the Act.

In formulating the Regulations, HUD concluded that while "there are ... aspects of the Amendments Act that have some economic impact and will thus affect property rights ..., none of these impacts ... rises to the level of a 'taking' within the meaning of the Fifth Amendment of the United States Constitution." 54 Fed.Reg. 3232, 3281 (Jan. 23, 1989)

Defendant contends that because there will now be a wider group of potential buyers for Plaintiffs' properties as a result of the Act (if Plaintiffs do not qualify for the "Housing for Older Persons" exemptions of the Act), the resale value of the property may increase, or at least will not be diminished. All but one Plaintiff stated in their interrogatories that either their properties have increased in value since their purchase or have actually resold at a profit. One Plaintiff did state that her property had decreased in value, but it has not been established that the Act is the cause of this decrease in value, especially since the mobile home park has continued to be senior housing since the Act's passage.

Defendant also argues that, assuming that Plaintiffs' property has decreased in value somewhat, the case of *Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) made it clear that most diminutions in the economic value of a property will be insufficient to constitute a taking. The Court in *Euclid v. Ambler Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) upheld regulation that diminished property value by 75%. In *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), the Court upheld a regulation that caused a diminution in property value of 87½%.

Defendant asserts that Plaintiffs would be left with viable and other uses of their homes. Defendant states that the Act would not take the use of Plaintiffs' properties as a place to sleep, to eat, to converse privately, to enjoy amenities or any of the things which serve as the core value of a home. Defendant also argues that the Act would not deprive Plaintiffs of the many ways to increase the economic and subjective value of their homes because they will still be allowed to continue to reside and enjoy the many benefits of their homes.

None of the discussion as to Florida's special recognition of the group ownership nature of certain property is relevant to the issues involved in this case. Even when a state recognizes a certain property right as a separate interest, its abrogation is not necessarily a taking. Defendant relies on the aforementioned cases of *Keystone* and *Penn Central*.

In *Keystone, supra*, the Court recognized that the support estate regulated in the statute could be separately bought and sold. In *Penn Central, supra*, the Court addressed the claim that the law deprived plaintiffs of any gainful use of their air rights. In both cases, the Courts found no taking and instead focused on "the extent of the interference with rights in the parcel as a whole." *Keystone* 480 U.S. at 497, 107 S.Ct. at 1248; *Penn Central* 438 U.S. at 130, 98 S.Ct. at 2662.

In conclusion, this Court finds that the Act does not destroy the economic viability of Plaintiffs' property. The Act does not physically invade their property, but instead would adjust the benefits and burdens of economic life to promote the common good.

This Court finds, for the aforementioned reasons, that the Act does not constitute a taking of Plaintiffs' property in violation of the Fifth Amendment of the United States Constitution.

Accordingly, it is

ORDERED that Plaintiffs' memorandum in Opposition to Defendants cross motion for summary judgment will be considered; it is further

ORDERED that Defendant's motion to strike portion of summary judgment and Defendant's corrected motion to strike portion of Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgement are denied; it is further

ORDERED that Plaintiffs' reply to Defendants motion to strike portion of Plaintiffs' memorandum in opposition to Defendant's cross motion for summary judgment by Plaintiffs is granted; it is further

ORDERED that Plaintiffs' motion for summary judgment is denied, and the request for oral argument is denied; it is further

ORDERED that Defendant's cross motion for summary judgment and reply to Plaintiffs' motion for summary judgment is granted; it is further

ORDERED that the Clerk is directed to enter final summary judgment in favor of Defendant in final dismissal of this case.

DONE and ORDERED.