**Joseph W. MASSARO and Patricia Ann Massaro, etc., Plaintiffs,**

v.

**MAINLANDS SECTION 1 AND 2 CIVIC ASSOCIATION, INC., Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**MAINLANDS SECTION 1 AND 2 CIVIC ASSOCIATION, INC., Defendant.**

**Nos. 90–6297–CIV, 91–6625–CIV.**

United States District Court,
S.D. Florida.

June 8, 1992.

Kathleen Marie Burgener, Alan Steven Becker, Becker, Poliakoff & Streitfeld, P.A., Fort Lauderdale, Fla., for Mainlands Section 1 & 2 Civic Ass'n, Inc.

Michael R. Masinter, Nova University Center for the Study of Law, Fort Lauderdale, Fla., Alan G. Ehrlich, Jacaranda Lakes, Fla., for Joseph W. Massaro and Patricia Ann Massaro.

Barbara Kammerman, Housing and Civ. Enforcement Section, Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

## MEMORANDUM OPINION

RYSKAMP, District Judge.

These cases were brought by the plaintiffs to enforce the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* They were consolidated, and a non-jury trial was held from April 27 to April 30, 1992. Judgment having been rendered at the conclusion of the trial for the defendant in each case, the court now issues the following Memorandum Opinion.

### Background

The Mainlands Section One and Two is a residential subdivision of 529 homes located in Tamarac, Florida. Each home is subject to a declaration of restrictions. Article 4 of the amended declaration of restrictions bars children under 16 years of age from residing in any home in the community.

The plaintiff Massaros live in the Mainlands. They had a child on July 11, 1989. On September 26, 1989 the Mainlands Association, the community's governing body, sent a letter to the Massaros seeking to enforce Article 4 of the deed. The Massaros then filed a complaint against the Association in this court, and with the Department of Housing and Urban Development (hereinafter "HUD"), under the Fair Housing Amendments Act of 1988.[1] Thereafter, on April 13, 1990, the Association enacted an amendment to their bylaws restricting occupancy in the subdivision to persons 55

---

1. The Fair Housing Amendments Act of 1988, which prohibits discrimination in the sale or rental of housing in part on the basis of "familial status", took effect on March 13, 1989. *See* 42 U.S.C. § 3604. It provides for two methods of enforcement. A private party plaintiff may file suit in federal court. 42 U.S.C. § 3613(a)(1)(A). The plaintiff may also file a complaint with the Department of Housing and Urban Development. 42 U.S.C. § 3610(a)(1)(A)(i). The plaintiff Massaros elect-ed to proceed under both methods. If HUD finds reasonable cause to believe that the defendant has violated the Fair Housing Act, it files a charge of discrimination. 42 U.S.C. § 3610(g)(2)(A). In this case, the Secretary found reasonable cause, and, after the parties elected to have their dispute decided in federal court pursuant to 42 U.S.C. § 3612(*o*), the United States filed suit on behalf of the Massaros in this court.

years of age or older.[2]

The Mirabiles also live in the Mainlands. After their child was born, the defendant sent a letter to them dated September 7, 1990, seeking to enforce Article 4 of the amended declaration of restrictions. The Mirabiles then filed a complaint with HUD. Pursuant to HUD's finding that it had reasonable cause to believe that the defendant had violated the Fair Housing Amendments Act of 1988, and pursuant to the parties' election to have this case heard in federal court, HUD filed suit against the defendant, and the court then consolidated the cases.

### Legal Issue

In 1988 Congress passed the Fair Housing Amendments Act. That law wrought major changes to the Fair Housing Act of 1968 (hereinafter "Title VIII"). Among those changes was Congress' decision to include families with children within the scope of Title VIII. The practical effect of that amendment was to make it illegal for housing providers to discriminate against families with children.

However, the amendment also created a narrow exception to that proscription. Section 3607(b) of Title 42 provides that "housing for older persons" shall be excluded from that part of Title VIII which makes discrimination against families with children illegal. That statute also defines housing for older persons. It provides that housing for older persons is: (A) a State or Federal housing program that is determined by the Secretary of Health and Human Services to be specifically designed and operated to assist elderly persons; (B) housing that is intended for, and solely occupied by, persons 62 years of age or older; or (C) housing that is intended and operated for occupancy by at least one person 55 years of age or older per unit.

The defendant, Mainlands Association, argues that it qualifies as housing for older persons because the Mainlands is intended and operated for occupancy by at least one person 55 years of age or older per unit. The plaintiffs disagree. A factual determination that the Mainlands qualifies, or does not qualify, under 42 U.S.C. § 3607(b)(2)(C) as housing for older persons, will therefore be determinative of this case.

### The "55 or Older" Exemption

Congress provided further interpretive guidance when it defined housing that is intended and operated for occupancy by at least one person 55 years of age or older per unit. Specifically, it created three *de minimus* requirements for a development to satisfy the 55 or older test. First, the housing facility must have significant facilities and services that are specifically designed to meet the physical or social needs of older persons. Second, at least 80 percent of the units must be occupied by at least one person 55 years of age or older per unit. Third, the housing facility must publish policies and procedures which demonstrate an intent by the owner or manager to provide housing for persons 55 years of age or older. *See* 42 U.S.C. § 3607(b)(2)(C).

Congress also directed the Secretary of Housing and Urban Development to develop regulations. *Id.* In compliance, the Secretary has promulgated regulations that list qualifying examples of significant facilities and services and policies and procedures that demonstrate an intent to provide housing for older persons. *See* 24 C.F.R. § 100.304 (1990).

Section 100.304(b)(1) provides that, [s]ignificant facilities and services specifically designed to meet the physical or social needs of older persons' include, but are not limited to, social and recreational

---

**2.** That provision states in pertinent part, "Inasmuch as the Mainlands Section 1 & 2 Civic Association, Inc. is designed and intended as a retirement community for older persons, to provide housing for residents who are fifty-five (55) years of age or older ... [n]o permanent occupancy of any lot shall be permitted by an individual [less than] fifty-five (55). Notwithstand-

ing same, the Board in its sole discretion shall have the right to establish hardship exceptions ... providing that said exceptions shall not be permitted in situations where the granting of a hardship exception would result in less than 80% of the lots in the community having less than one resident fifty-five (55) years of age or older...."

programs, continuing education, information and counseling, recreational, homemaker, outside maintenance and referral services, an accessible physical environment, emergency and preventive health care of programs, congregate dining facilities, transportation to facilitate access to social services, and services designed to encourage and assist residents to use the services and facilities available to them. 24 C.F.R. § 100.304(b)(1).[3]

That regulation is careful to note that the housing community need not have all of the features mentioned to qualify under that prong. *See* 24 C.F.R. § 100.304(b)(2). *See also Seniors Civil Liberties Association v. Kemp*, 761 F.Supp. 1528 (M.D.Fla.1991) (extent of significant facilities and services may vary with size of complex and selling price of units, and as a practical matter is tied to age of residents). Moreover, HUD stressed that "[a] housing facility may have significant facilities and services designed to meet the physical *or* social needs of older persons and still provide housing for active older persons who live very independently." 24 C.F.R. Ch. 1, Subch. A., App. 1 686, 719 (Preamble to Final Rule Implementing Fair Housing Amendments Act of 1988) (1990) (emphasis in original). HUD also noted that not only could facilities and services on the list qualify if they are associated with active older persons, but that the types of qualifying services and facilities could vary by geographic location and by the needs of the residents. *Id.*

Also, the regulations establish six nonexhaustive factors which are relevant for determining whether the housing facility has published and adhered to policies and procedures which demonstrate an intent to provide housing for persons 55 years of age or older. These include: (i) the manner in which the housing facility is described to prospective residents, (ii) the nature of any advertising designed to attract prospective residents, (iii) age verification procedures, (iv) lease provisions, (v) written rules and regulations, and (vi) actual practices to enforce relevant lease provisions and relevant rules or regulations. 24 C.F.R. § 100.-304(c)(2).

There is, however, an anomaly in both the statute and the regulations. In creating the "policies and procedures" prong of the 55 and over exemption, Congress determined that it is the owner or manager's intent that is relevant for establishing whether the development in question seeks to provide housing for older persons. *See* 42 U.S.C. § 3607(b)(2)(C)(iii). The regulations, in turn, take their cue from the statute, and discuss the relevant factors in terms of the owner or manager's compliance with the published policies and procedures. *See* 24 C.F.R. 100.304(c)(2).

In the case at bar, however, there is no centralized owner or manager to speak of. Rather, the Mainlands is a community of freestanding single family homes that was completed in 1964. The closest entity that the Mainlands has to an owner or manager is the Association. Because the Mainlands is composed of single family homes, and the original developer no longer maintains an ownership or managerial interest, the court has found most of the case law that has interpreted the over 55 test of the housing for older persons exemption to be inapposite to this case. *See e.g. Park Place Home Brokers v. P.K. Mobile Home Park*, 773 F.Supp. 46 (N.D.Ohio 1991) (mobile home park run by a single manager); *Lanier v. Fairfield Communities*, 776 F.Supp. 1533 (M.D.Fla.1990) (new development in which almost one half of the lots had not been sold, and were held in trust by a trustee).

Finally, the regulations restate the statutory requirement that 80% or more of the

---

**3.** The regulations also provide that a facility that does not have significant facilities and services can still qualify for the housing for older persons exemption by meeting the other two prongs, by demonstrating that it is not practicable to provide significant facilities and services, and by demonstrating that the development is necessary to provide important housing opportunities for older persons. 24 C.F.R. § 100.-304(b)(2). However, neither party has asserted that this default provision should apply to this case. Also, because the court finds, *infra* that the Mainlands meets the significant facilities and services prong of the housing for older persons test, it need not discuss this issue further.

households contain at least one member over 55 years of age. However, that regulatory provision does not contain any additional information that is helpful to the court for purposes of this case. *See* 24 C.F.R. § 100.304(c)(1).[4] Specifically, the regulations do not provide any guidance for determining how a defendant is to meet its burden of proof to show that at least 80% of the households contain at least one member over 55.

### Application of the Exemption to this Case

■ There is no dispute as to the law that is applicable to this case. Moreover, most of the facts are not disputed. The parties do disagree, however, as to the significance of the facts, and the application of the facts to the law. The principal dispute is whether the defendant meets the "policies and procedures" prong of the housing for older persons exemption. However, because the plaintiffs also argue that the Mainlands does not meet the "significant facilities and services" prong, and that the Mainlands cannot demonstrate that 80% or more of the units contain at least one member over the age of 55, the court discusses those requirements as well. In doing so, the court acknowledges that the housing for older persons exemption should be narrowly applied. *Elliott v. City of Athens, Georgia*, 960 F.2d 975, 978–79 (11th Cir.1992).

1. Policies and Procedures

■ To begin, the court finds that several of the factors that have been developed by the Secretary to determine whether a community meets the policies and procedures prong are inapplicable to this case. The first and second factors that are contained in the regulations are inapplicable because the Association does not describe the Mainlands to anyone, nor does it advertise for prospective residents. The Association does not perform these functions because it is not the Association's responsibility to attract prospective residents; rather,

the responsibility for this task falls on the individual homeowner.

The court finds that with respect to the third factor, age verification procedures, the defendant did establish appropriate mechanisms once the amendments to Title VIII took effect. It did so through the Association's board, and its welcome committee. The court notes, however, that this factor has limited application to this case because the court believes that the statute and the regulations contemplated a situation where a single centralized entity—the owner or the manager—could readily establish the requisite verification procedures.

The Association could have taken steps to meet the fourth factor by requiring lease provisions to include the over 55 requirement. They do, however, urge their owners to call attention to the deed restrictions if they do lease their homes. The court finds that in any event this fact has limited applicability because the community is populated mostly by single family homeowners.

■ The fifth factor, written rules and regulations, was the subject of some dispute between the parties. The defendant argues that it had passed a bylaw to limit occupancy of the housing units so that at least 80% of the units in the community would be required to contain at least one person over 55 years of age. If true, this would establish to the court's satisfaction that the defendant had indeed published a policy that demonstrated an intent to provide housing for older persons. The plaintiffs counter, however, that the bylaw was illegal because it was enacted in contradiction to the Association's own Articles of Incorporation. The court must therefore determine whether the bylaw is valid.

Article 11 of the Association's Articles of Incorporation requires that the initial bylaws be established by a majority vote at the first meeting after incorporation. Thereafter, the Articles of Incorporation

---

**4.** The regulations do except newly constructed housing facilities from the 80% requirement until 25% of the units are occupied. *See* 24 C.F.R. § 100.304(c)(1). However, because the Mainlands has been "built out" for over twenty years, the provision is inapplicable to this case.

provide that the bylaws may be altered only by a two-thirds vote of the membership. The term "membership" is an ambiguous one. The plaintiffs argue that it means the entire membership of the Association. Under this reading, the bylaws could only be amended if two-thirds of all of the homeowners vote in favor of the amendment. The defendant, on the other hand, argues that the term refers only to those members that are present at a properly noticed meeting to vote on whether the amendment should pass.[5] To construe the term, the court turns to the manner in which the Association itself has interpreted it in the past.

The Association adopted its bylaws on November 23, 1971.[6] Article 10 Subsection B.2. of those bylaws requires a quorum of 75 or more to take action, and two-thirds of the members in attendance to vote in favor of a change or amendment. This requirement was carried over in the bylaws that were adopted in 1975 and 1980. In 1984, the Association again adopted an entirely new set of bylaws. In these bylaws, Article 13 established a new procedure for subsequent amendments. That article provided that the presiding officer would, after discussion, request a standing vote of the property owners in attendance. If two-thirds of that population voted in the affirmative the amendment would be adopted. From this evidence, the court reads the term "membership" to mean those members of the Association who are present at a meeting, and that the two-thirds voting margin therefore refers to a two-thirds margin of the members who are present at the meeting in question.[7]

The 1990 bylaw amendment passed by a vote of 160 to 6. This was clearly in excess of the two-thirds requirement, and was therefore valid. As such, the bylaw provision establishes that the defendant met the written "rules and regulations" factor of the HUD regulations.[8]

Finally, the defendant has provided sufficient evidence to show that it has engaged in actual practices to enforce the rules or regulations that establish an intent to provide housing for older persons. The defendant did send letters to the plaintiffs in this case to enforce the bylaws. It also has

---

**5.** The court notes that this interpretation also comports with the Florida Business Corporation Act, Fla.Stat. Chap. 607, which provides that action may be taken by shareholders if a majority of "the votes cast by the holders of the shares *represented at the meeting and entitled to vote"* favors the action. Fla.Stat. § 607.0727(3) (1992) (emphasis added). This provision is made applicable to non-profit corporations that do not provide for voting requirements in their articles of incorporation or bylaws by Fla.Stat. § 617.-041.

**6.** In fact, the Association adopted a set of rules called the "Constitution and Bylaws". However, the Articles of Incorporation serve as the Association's constitution. Accordingly, the court treats the document called "Constitution and Bylaws" simply as the Association's bylaws.

**7.** In 1988 the Association again effected a wholesale change in the procedure for amending the bylaws. These 1988 changes retained the two-thirds requirement. At the meeting held October 14, 1988 the Association's secretary noted, however, that the revised bylaws were approved by the board and a majority of the property owners present. The fact that these new bylaws were passed by a majority vote reflects either a mistake in the recordation of the events of the meeting, or that the 1988 changes were illegal. Resolution of this anomaly is immaterial for purposes of this case, however, because the two-thirds requirement was a carry-over from the valid 1984 amendments so that if the 1988 amendments were illegal, the court would merely analyze whether the bylaw change in question was passed in conformity with the earlier legal procedures.

**8.** The court notes that the bylaw is, as a practical matter, unenforceable because the requirement is not also contained in the declaration of restrictions to the individual homes. In other words, if a sufficient number of the Mainlands' homeowners chose to sell their homes to individuals or couples who were all under 55 years of age, thereby bringing the community under the 80% requirement that is required by the first prong of the test, the community would no longer qualify as housing for older persons. Accordingly, the court's decision in this case means only that the Mainlands qualifies at the present time. It does not serve as an adjudication that the Mainlands will always meet the requirements for the housing for older persons exemption. Since the Mainlands meets the 80% requirement for the relevant time period of this law suit, and since the court is concerned with the bylaw provision only to determine whether it establishes the "intent" to create housing for older persons, the actual enforceability of the bylaws is irrelevant to this case.

implemented screening procedures, through the welcome committee, in an attempt to remain above the 80% requirement.[9]

After applying those factors that are relevant—the defendant's written rules and regulations, actual practices in enforcing lease provisions and relevant rules and regulations, and to a limited extent its age verification procedures—the court finds that the Association meets the "policies and procedure" requirement.

■ The plaintiffs have furnished the court with *United States, et. al. v. TEMS Association*, HUD ALJ No. 04-91-0064-1 (HUD Office of Administrative Law Judges, April 9, 1992), a decision by an administrative law judge that found that a community very much like the defendant in this case did not meet the 55 or over exception because the community had not proved any of the three prongs as required by the statute. The court disagrees with the approach taken by that administrative law judge with respect to his interpretation of the six factors that are set out in the regulations. In particular, it disagrees with the administrative law judge's application of some of the factors to free standing single homes where the developer retains no overriding interest in the community at the time of the alleged violation. This court believes that disregarding those inapplicable factors is more consistent with Congress' attempt to balance the rights of the elderly with the right of single families to affordable housing.

2. Significant Facilities and Services

■ The defendant proffered abundant evidence of the types of facilities and services that are designed to meet the needs of older persons in the Mainlands. Review by the court of one issue of the Mainlander, the Association newsletter, showed social programs such as square dancing, bridge, line dancing, pot luck suppers, dinner shows, Las Vegas trips, men's and women's clubs, pancake brunches, horse racing, a Super Bowl party, movies, bingo and bar-b-cues, among others. The court also heard testimony that there is a bowling league, fitness programs, shuffleboard and a swimming pool. This demonstrates that the defendant provides sufficient social and recreational programs. The Mainlander newsletter also advertises that the Association provides art classes and Bible study classes. This conforms with the continuing education factor in the regulations. The court also heard testimony regarding sewing and other homemaker services, which are specifically mentioned as relevant activities in the regulations. The Association also provides outside maintenance services, and referral services such as plumbing and electrical work. There are no curbs in the streets, and the homes are all single level, so that there are no physical barriers to the community for people in wheelchairs. The Association also provides blood pressure tests for its residents, it has a telephone reassurance committee and it provides other physical programs on a periodic basis. The Association has in the past planned trips to Las Vegas, Lake Wales and Miami. Participation in all of these activities is encouraged formally through the Mainlander newsletter. On these facts the court finds that this evidence is sufficient to demonstrate that the Mainlands meets the "significant facilities and services" prong that is required by the statute.

3. Eighty Percent Requirement

■ To prove that it met the eighty percent requirement, the defendant proffered three studies that they conducted. The first study was done in January, 1989. The Association furnished each resident with a questionnaire. However, there was some concern over the validity of that study because there was no procedure for verifying the age of the residents. So a second study was performed in December 1989. The Association attempted to verify the results of that study through the use of social security numbers, however, it later became apparent that that was impossible. Finally, a third study was conducted be-

---

**9.** Although the sixth factor also discusses actual practices to enforce relevant lease provisions, the court finds this element inapplicable here. As discussed *supra,* the Mainlands is a community of single family homes, and, absent an age restriction provision in the declaration of restrictions, the Association has no power to invalidate a lease.

tween November 1990 and April 1991, and the residents' ages were verified through use of a driver's license or some other document. The results of all three studies demonstrated that over 90% of the houses in the Mainlands had at least one resident who was over 55 years of age. The plaintiffs have offered no evidence to contradict the defendant's showing. The court notes that neither the statute nor the regulations provides any guidance for determining whether the defendant's studies are sufficient to demonstrate that the 80% requirement has been met. In the absence of such guidance, the court finds that on these facts, the defendant has met its burden to demonstrate that at least 80% of the units in the Mainlands were occupied by at least one person over the age of 55.

### Conclusion

The court finds as a factual matter that the Mainlands 1 and 2 qualifies as housing for older persons, and therefore is exempt from the provisions of the Fair Housing Amendments Act of 1988 that prohibits housing providers from discriminating against families with children. Therefore, final judgment will be rendered for the defendants by separate order of this court. All findings and conclusions made at trial and not specifically mentioned in this order are hereby adopted.

DONE AND ORDERED.

